UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

* * * * * * * * * * * * * * * * * * *

ORDER

* * * * * * * * * * * * * * * * * * *

Nikki Miskovich and
Robert Zuehlke, Jr.,

Plaintiffs,

vs.

Independent School District
318; Itasca County, Minnesota;
St. Louis County, Minnesota;
City of Grand Rapids, Minnesota;
Myles Reif Performing Arts Center;
David Marty; Ron Hohman; Jerry
Cuffe; Jason Akerson; Tim
Peterson; Joseph Zebro; Bernard
Mettler; Michael Scott; and
Randall Lehman,

Defendants. Civ. No. 00-1944 (RLE)

* * * * * * * * * * * * * * * * * * *

Ellen Schafroth; Beverly
Wilson and David Wilson,

Plaintiffs,

vs.

City of Grand Rapids,

Defendant,

and

St. Louis County, Minnesota;
Ron Hohman; Jerry Cuffe; Jason
Akerson; Tim Peterson; Joseph

FILED JUL 29 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD_______
DEPUTY CLERK_______

Zebro; Bernard Mettler; Michael
Scott; and Randall Lehman,

Defendants and
Third-Party
Plaintiffs,

vs.

Myles Reif Performing Arts Center,
and David Marty,

Third-Party
Defendants. Civ. No. 01-824 (RLE)

* * * * * * * * * * * * * * * * * * *

At Duluth, in the District of Minnesota, this 29th day of July, 2002.

## I. Introduction

These matters came before the undersigned United States Magistrate Judge pursuant to the consent of the parties, in accordance with the provisions of Title 28 U.S.C. §636(c), upon the Motions of the Defendants', and of the Third-Party Defendants', for Summary Judgment, as well as upon the Plaintiffs' Motion to Amend their Complaints. A Hearing on the Motions was conducted on January 17, 2002, at which time, the Plaintiffs appeared by John D. Undem, Esq.; the Defendants, and Third-Party Defendants, Myles Reif Performing Arts Center ("Reif Center"), and David Marty ("Marty"), appeared by Michael T. Feichtinger, Esq.; the Defendant City of Grand Rapids ("Grand Rapids") appeared by Jon K. Iverson, Esq.; and

the Defendants, and Third-Party Plaintiffs, St. Louis County, Jason Akerson ("Akerson"), Jerry Cuffe ("Cuffe"), Ron Hohman ("Hohman"), Randall Lehman ("Lehman"), Bernard Mettler ("Mettler"), Tim Peterson ("Peterson"), Michael Scott ("Scott"), and Joseph Zebro ("Zebro"), appeared by Shaun R. Floerke, Esq.

For reasons which follow, we grant the Motions for Summary Judgment of Akerson, Lehman, the Reif Center, and Marty; we grant, in part, the Motions for Summary Judgment of Grand Rapids, St. Louis County, Peterson, and Scott; and we deny the Motions for Summary Judgment of Cuffe, Hohman, Mettler and Zebro. In addition, we grant the Plaintiffs' Motion to Amend their Complaints.

## II. Factual and Procedural History

These cases arise from injuries, which were allegedly inflicted upon the Plaintiffs, during the conduct of a training exercise at the Grand Rapids High School, on July 14, 1999. The Plaintiffs are Nikki Miskovich ("Miskovich"), her husband Robert Zuehlke, Jr., Ellen Schafroth ("Schafroth"), Beverly Wilson ("Wilson"), and her husband David Wilson.[1] The Plaintiffs, in both cases, have sued

---

[1]The husbands of both Miskovich, and Wilson, have pled claims for a loss of consortium, and companionship. These claims are solely derivative of the actions commenced by their respective wives and, therefore, they rise or fall on the success, or failure, of the wives' claims. See, Alholm v. O'Bryan Law Firm, 2000 WL 1196202 at *7 (D. Minn. March 27, 2000)("In Minnesota, a claim for loss of consortium is a derivative action and, therefore, does not (continued...)

Grand Rapids, St. Louis County, Akerson, Cuffe, Hohman, Lehman, Mettler, Peterson, Scott, and Zebro, while Miskovich, and her husband, have also sued the Reif Center and Marty.[2] In addition, the Reif Center, and Marty, have been joined, as Third-Party Defendants, by St. Louis County, Akerson, Cuffe, Hohman, Lehman, Mettler, Peterson, Scott, and Zebro, in the action brought by Schafroth, Wilson, and Wilson's husband. All of the Defendants, and the Third-Party Defendants, seek Summary Judgment, on the bases of a variety of defenses. In addition, each of the Plaintiffs seek leave to amend their respective Complaints, in order to clarify that they are suing the Defendants, in both their official and individual capacities.

While the Defendants played somewhat different roles in the events, which generated these actions, we will outline the undisputed facts, highlight any factual disputes, and then address the claims against each of the Defendants separately, insofar as

---

[1](...continued) exist independent of the injured spouse's right to maintain an action for the injuries sustained."), citing Thill v. Modern Erecting Co., 284 Minn. 508, 513, 170 N.W.2d 865, 869 (Minn. 1969). Accordingly, we do not separately address these derivative claims.

[2]Although Miskovich, and her husband, had also sued Independent School District #318, and Itasca County, both Defendants were subsequently dismissed, voluntarily, on April 17, 2001. See, Stipulation of Dismissal and Judgment, Civ. No. 1944 [Docket Nos. 32 and 33].

they are distinct. Much of what we recite gives proof to the adage that, "[i]n any great organization it is far, far safer to be wrong with the majority than to be right alone."[3]

On July 14, 1999, Schafroth, and Wilson, were employees of the Reif Center, while Miskovich was a newly hired independent contractor, who had begun teaching a Summer class, at the Reif Center, approximately one week before the incident giving rise to these actions, although the first class, for which Miskovich was paid, was in September of 1999. See, Deposition of Nikki Miskovich, at 62, 80-85, Ex. B to Aff. of John D. Undem ("Miskovich Deposition"); Deposition of Ellen Schafroth, at 5-6, Ex. C to Aff. of John D. Undem ("Schafroth Deposition"); Deposition of Beverly Wilson, at 6, Ex. D to Aff. of John D. Undem ("Wilson Deposition"). Miskovich visited the Reif Center, on July 14, 1999, in order to meet with Wilson, who was the dance director at the Reif Center, and to begin preparing for her dance classes. See, Miskovich Deposition, at 60. In addition to Miskovich and Wilson, four other employees were in the Reif Center on July 14, 1999, including Schafroth, Jennifer Lien ("Lien"), Robert Cline ("Cline"), and Marty. The Reif Center, and the Grand Rapids High School, are physically attached, and

[3]Galbraith, John Kenneth, Guardian (London, July 28, 1989).

there are only two entrances, by road, to the campus. See, Ex. A to Aff. of John D. Undem.

In the wake of the events, in April of 1999, at Columbine High School, in Littleton, Colorado, Stephan Valley ("Valley"), who was a Grand Rapids Police Officer, and the training coordinator for the Grand Rapids Emergency Response Team ("Grand Rapids ERT"),[4] began to plan a training exercise involving the Grand Rapids Senior High School. See, Deposition of Stephen Valley, at 5-8, Ex. I to Aff. of John D. Undem ("Valley Deposition"). Valley wanted to set up a scenario, which would involve a hostage-rescue type situation, and which would employ the Grand Rapids High School facility, as well as its students. See, Deposition of Randall Lehman, at 8, Ex. O to Aff. of John D. Undem ("Lehman Deposition"). Initially, Valley contacted Joe Silko ("Silko"), who was the Principal of the High School, and Mark Adams ("Adams"), the Assistant Principal, about coordinating the training exercise at the school. See, Valley Deposition, at 8-9. Silko and Adams were interested in the training exercise. Id.

[4]The Grand Rapids ERT is composed of approximately twenty-five members. See, Deposition of Stephen Valley, at 6-7, Ex. I to Aff. of John D. Undem ("Valley Deposition"). Half of the members are Grand Rapid's Police Officers, while the other half are Itasca County Sheriff's Deputies. Id.

In May of 1999, Valley contacted Lehman, who was the Commander and Coordinator of the St. Louis County Emergency Response Team ("St. Louis County ERT"), about participating in the training exercise. See, Lehman Deposition, at 8. Lehman thought it would be a good idea, and an excellent opportunity in light of the recent Columbine shootings. Id. St. Louis County was not involved in planning the exercise, but was only asked to participate. Id. at 14-15.

Next, Valley held several meetings with school officials concerning the planning of the training exercise. See, Valley Deposition, at 9. As already noted, during the first meeting, which occurred about a month or two prior to the training, see, id. at 9; Deposition of Mark Adams, at 6, Ex. H to Aff. of John Undem ("Adams Deposition"), Valley, Silko, and Adams, agreed to have the training exercise during the Summer, because then there would be the least number of people at the school. See, Valley Deposition, at 10. They also talked about the crisis training exercise in general terms. See, Adams Deposition, at 7. The training details were left to the law enforcement officials, however. Id.

Approximately one week later, Valley and Adams met again. Id. During the meeting, they roughed out the parameters of the area to be used in the training exercise. Id. at 7-8; see also, Valley Deposition, at 10. The exercise was to include three to five

classrooms around the high school office, the high school office, and a chemistry, or physics laboratory, on the third floor. See, Adams Deposition, at 8.

Valley and Adams met a third time and, along with another officer who, Adams believed, worked with the Grand Rapids Police Department, walked through the rooms to be used in the training exercise. Id. at 9-10. Apparently, at that time, there was some discussion about the Reif Center not being a part of the training exercise. Id. at 10-12; see also, Valley Deposition, at 10-12 (remembering a discussion regarding the fact that the Reif Center was off limits, but not when the discussion occurred). There is a disagreement, between Valley and Adams, though, as to whether there was a particular discussion regarding who would notify people about the training, with Valley recalling a specific discussion, in which it was agreed that Adams had the responsibility of notifying those individuals, who would be in the school during the training exercise, such as teachers and students. Valley Deposition, at 25-26. Adams denies such a discussion, however. Adams Deposition, at 12-13. Nevertheless, Adams took it as his responsibility to notify the students, the parents, and the Summer school and teaching staffs, see, id. at 12-13, and Valley believed that the school would be notifying the Reif Center staff, see, Valley Deposition,

at 53. Valley never had any communication with the Reif Center about the training exercise. Id. at 95.

In addition to the notifications provided by Adams, Valley also contacted the newspaper, prior to July 14, 1999, and told them that a training exercise was to take place. Id. at 21. He further notified the public television, and the local radio stations, about the training exercise. Id. at 22-23. Valley did not follow-up, however, to verify whether anything had been placed in the newspaper, or had been broadcast on the radio or television stations. Id. at 21-22. Moreover, there is no evidence, that we have uncovered, or that has been flagged by the parties, about anyone having seen any such notifications, and only one individual recalls hearing about the training, at some point, during the morning of July 14, 1999. See, Deposition of Ann Helmer, at 51-52, Ex. K to Aff. of John Undem ("Helmer Deposition").

On June 15, 1999, Valley, Lehman, Adams, and five to seven other individuals, conducted a walk-through of the Grand Rapids High School. See, Adams Deposition, at 27; Valley Deposition, at 15-17; Lehman Deposition, at 9-10. According to Lehman, the individuals, who represented the St. Louis County ERT, were Bill Hanegmon and himself. Lehman Deposition, at 9. The purpose of the walk-through was to show everyone the facility, as some of them had never been there before. See, Valley Deposition, at 16. The group

toured the majority of the facility, including the boiler room, gym, locker rooms, office lobby area, and several surrounding classrooms. See, Adams Deposition, at 27-28. During the tour, the law enforcement personnel were told that the Reif Center, and several other portions of the building, would not be involved in the training exercise. See, Valley Deposition, at 17; Lehman Deposition, at 11. According to Lehman, though, by the end of the exercise, even though he knew the Reif Center would not be involved, he did not know the precise dimensions of the Reif Center, and he recalled that Valley, or Adams, had stated that the officers were only to enter through open doorways, and that any locked doorway would be off limits. Lehman Deposition, at 11-13. Lehman did not understand that the Reif Center had its own entrance, or offices. Id. at 12. The tour group did, however, view parts of the Reif Center, including the performing arts stage, which was reached through an internal entrance. Id. at 11-12.

As the walk-though was concluding, Marty, who was the director of the Reif Center, purportedly came up to Adams, and asked what was occurring. See, Adams Deposition, at 43-45. Marty is alleged to have made some "offhand remark about there being a lot of people in uniforms; it looked like some kind of invasion." Deposition of David Marty, at 34, Ex. G to Aff. of John D. Undem ("Marty Deposition"). Adams assertedly told Marty about the training exercise,

and the date on which it was to take place. See, Adams Deposition, at 43-45. Marty claims, however, that he was confused as to the particular day on which the training exercise was to occur, and he contends that he believed that, when he spoke to Adams, the training had already concluded. Marty Deposition, at 34.

Later that week, Adams called the Reif Center, and spoke with Lien, who was Marty's assistant. See, Adams Deposition, at 46-47; Deposition of Jennifer Lien, at 31, Ex. E to Aff. of John D. Undem ("Lien Deposition"). Adams wanted to ensure that there would be no students, or activities, scheduled at the Reif Center, which would warrant further notices to those groups. See, Adams Deposition, at 46. During the course of that conversation, he also briefly mentioned the training exercise, or drill. Id.; Lien Deposition, at 31. Lien informed Adams that no students were scheduled to be at the Reif Center, on the day of the exercise. See, Adams Deposition, at 47; Lien Deposition, at 31. She also told Marty that Adams "had called to ask if we had dance lessons on" July 14, "because they were going to be doing a drill." Lien Deposition, at 32. Lien believed that Marty had made a mental note of the phone call. Id.

Prior to the actual training exercise, Valley formulated several different training scenarios. See, Valley Deposition, at 27-29. All of the scenarios assumed a disturbance at the high school.

The first scenario involved an officer, who was downed in the parking lot of the school, while the second involved a classroom hostage situation. Id. The response teams had to determine how to deal with the hostage takers, the student hostages, and any wounded hostages. Id. The third scenario assumed a hostage/hazardous material situation, arising in a third floor chemistry laboratory. Id. In order to make the scenarios as realistic as possible, the situations needed to be fluid, or constantly changing. Id.; see also, Deposition of Patrick Medure, at 48, Ex. X to Aff. of John D. Undem ("Medure Deposition"). As a consequence, the participating teams would be told only basic information, and they would not be made aware of the changes that would confront them, in order to make the exercise realistic. See, Valley Deposition, at 29; Medure Deposition, at 48.

On the day of the training exercise, July 14, 1999, between 7:00 o'clock and 8:00 o'clock a.m., the Grand Rapids Police Department Reserves met for the training drill. See, Deposition of Jackie Heinrich, at 9, Ex. J to Aff. of John D. Undem ("Heinrich Deposition"); Helmer Deposition, at 7; Deposition of Anne Bylkas, at 7-8, Ex. L to Aff. of John D. Undem ("Bylkas Deposition"); Deposition of Lisa Kotula, at 8, Ex. N to Aff. of John D. Undem ("Kotula Deposition"). The Reserve Officers were to serve as the outer perimeter security force. See, Lehman Deposition, at 25; Helmer

Deposition, at 8-9; Bylkas Deposition, at 8. Perimeter security involved the barricading of the entrance to the campus with their bodies, and the stopping of vehicles to inform the occupants about the training drill. See, Helmer Deposition, at 8, 11, 13; Bylkas Deposition, at 8-9; Deposition of Nancy Sura, at 8, Ex. M to Aff. of John D. Undem ("Sura Deposition"); Kotula Deposition, at 11, 14. Valley understood that the Reserves would man their positions at 6:45 o'clock a.m. See, Valley Deposition, at 31. However, after being briefed on the exercise, most of the Reserve Officers did not man their positions until between 8:00 and 9:00 o'clock a.m. See, Helmer Deposition, at 10 (in position by probably 8:15 o'clock a.m.); Bylkas Deposition, at 8-12 (in position between 8:45 and 9:00 o'clock a.m.); Kotula Deposition, at 13 (in position by about 8:45 o'clock a.m.). No signs were placed near the entrances to advise of the training scenario. See, Valley Deposition, at 64.

When Wilson arrived for work on July 14, 1999, at 7:00 o'clock a.m., she claims that there were no barricades, or anything else, which would indicate that a tactical scenario would be occurring. See, Wilson Deposition, at 18, 24. The same was true for Marty, who arrived at 7:00 o'clock a.m., see, Marty Deposition, at 9-10; for Cline, who arrived at about 7:50 o'clock a.m., see, Deposition of Robert Cline, at 6-7, Ex. F to Aff. of John D. Undem ("Cline Deposition"); for Lien, who arrived somewhere around 8:00 o'clock

a.m., see, Lien Deposition, at 6-7; for Schafroth, who arrived between 8:30 and 9:00 o'clock a.m., see, Schafroth Deposition, at 19-22; and for Miskovich, who arrived between at 9:30 and 10:00 o'clock a.m., see, Miskovich Deposition, at 7-8. However, Adams, who apparently arrived at approximately 7:15 or 7:30 o'clock a.m., through a second entrance which was the furthest away from the Reif Center, and which was not, by all appearances, used by the Reif Center employees on that day, claims that barricades were being set up when he arrived, and that he was stopped by a female officer. Adams Deposition, at 19.

At approximately 8:00 o'clock a.m, the St. Louis County ERT, along with the Grand Rapids ERT, and other emergency management service members, arrived at either the Grand Rapids Fire Hall, or an arena, for briefing. See, Lehman Deposition, at 13; Deposition of Bernard Mettler, at 8-9, Ex. P to Aff. of John D. Undem ("Mettler Deposition"); Deposition of Joseph Zebro, at 8, Ex. Q to Aff. of John D. Undem ("Zebro Deposition"). Lehman maintains that he was informed by Valley, at some time prior to the training exercise, that the high school would be secured prior to the training, and that there would be signs, and barricades, which would alert people of the training program. Lehman Deposition, at 14. Prior to arriving at the fire hall on the day of the training, the St. Louis County ERT members -- which included Akerson, Cuffe, Hohman,

Lehman, Mettler, Peterson, Scott and Zebro -- understood that the training exercise would involve circumstances similar to the shootings at Columbine High School, including multiple suspects, multiple victims, and multiple role players, in a school setting. See, Mettler Deposition, at 9; Zebro Deposition, at 9; Deposition of Ronald Hohman, at 7-8, Ex. S to Aff. of John D. Undem ("Hohman Deposition"); Deposition of Michael Scott, at 7, Ex. T to Aff. of John D. Undem ("Scott Deposition").

Valley began the morning briefing by giving the team leaders, and Lehman, a quick overview of the possible scenarios. See, Valley Deposition, at 35; Lehman Deposition, at 53. Information was limited in order to make the situation as realistic as possible. Valley appears to have informed the group that: 1) some upset students entered the Grand Rapids High School; 2) school officials called law enforcement; 3) a marked patrol car responded to the call; 4) upon arriving at the school, the officers encountered gunfire; 5) one of the officers was hit and pinned down by gunfire; and 6) it was believed that the suspects were still in the school. See, Lehman Deposition, at 53; see also, Scott Deposition, at 10. Apparently, the teams were warned that the suspects could be deceptive, and could try to disguise themselves and escape, so the team members would have to be very careful in identifying the suspects. See, Lehman Deposition, at 54-55; Hohman Deposition, at 28.

Team members were also advised that exercise observers would be wearing orange vests. See, Lehman Deposition, at 114-15; Mettler Deposition, at 58-59; Zebro Deposition, at 10-11, 43; Hohman Deposition, at 11-12; Scott Deposition, 10-11, 54; Deposition of Jason Akerson, at 7, Ex. U to Aff. of John D. Undem ("Akerson Deposition"). Non-participants would not be wearing orange vests, and would tell the team members that they were not involved in the exercise, and should be left alone. See, Lehman Deposition, at 114-15; Mettler Deposition, at 30-31; Zebro Deposition, at 10-11; Hohman Deposition; at 11-12; Akerson Deposition, at 7; Deposition of Jerome Cuffe, at 21-22, Ex. V to Aff. of John D. Undem ("Cuffe Deposition"). Valley believed that everyone at the school facility knew about the training exercise, see, Valley Deposition, at 61, 90, and he so advised the officers at the briefing, id. at 61; Lehman Deposition, at 114-15; Mettler Deposition, at 30-31; Zebro Deposition, at 10-11; Scott Deposition, at 10-11, 54; Cuffe Deposition, at 21-22.

Valley instructed the group they were to enter the school facility only through unlocked doors. Valley Deposition, at 54-55; see also, Lehman Deposition, at 81; Mettler Deposition, at 10; Zebro Deposition, at 10; Cuffe Deposition, at 17. There were to be no forced entries into the school. See, Zebro Deposition, at 10. It was Valley's understanding that, prior to the exercise, school

janitors would unlock certain entry doors, but he did not double check those doors. See, Valley Deposition, at 55. It appears that, at no point during the briefing, did Valley inform the teams that the Reif Center was off limits. See, Mettler Deposition, at 12; Zebro Deposition, at 14; Scott Deposition, at 41; Akerson Deposition, at 45; Cuffe Deposition, at 17.

Immediately after learning of the first scenario, the training exercise commenced. Akerson and Cuffe were sent, by the St. Louis County ERT, as scouts to view the Grand Rapids High School. See, Mettler Deposition, at 12-13; Akerson Deposition, at 8; Cuffe Deposition, at 17. At approximately 9:25 o'clock a.m., Akerson and Cuffe returned, and met with their team in order to discuss the layout of the school, and their entry plan. See, Lehman Deposition, at 7; Mettler Deposition, at 13; Zebro Deposition, at 15; Akerson Deposition, at 10, 31. Valley was not involved in forming the individual, tactical plans. See, Valley Deposition, at 69-72, 89. Valley did, however, provide a map of the first floor of the high school to the emergency response team leaders. See, Valley Deposition, at 40-41, 60; Lehman Deposition, at 27-28. The Reif Center was not included on that map. See, Valley Deposition, at 45; Mettler Deposition, at 14; Cuffe Deposition, at 28. Neither was the second or third floor of the building, however, which was where the chemistry laboratory was located, that would later become

an issue in the scenario, arising from an assumed hazardous materials situation. See, Valley Deposition, at 41.

Cuffe, while scouting prior to the start of the training exercise, was concerned that there were construction people present, who might have been unaware of the training scenario, and he informed Lehman of that concern at the Command Center. See, Cuffe Deposition, at 20-21. Lehman assertedly replied that he would double check in order to assure that everyone was informed of the training exercise, and he then confirmed that all of the individuals knew of the training program. Id. at 21.

At approximately 9:45 o'clock a.m., the teams, and their commanders, left the fire hall and went to the arena by the high school. It was determined that a Command Center would be set up in that arena. See, Valley Deposition, at 30; Lehman Deposition, at 79-80. The purpose of the Command Center was to coordinate the movement of the response teams. The St. Louis County ERT, and the Grand Rapids ERT, used different radio channels, and consequently, their only communication was through the Command Center. See, Valley Deposition, at 44; Lehman Deposition, at 21-22. The commanders of both teams, including Lehman, stayed at the Command Center and did not proceed into the high school. See, Valley Deposition, at 36; Lehman Deposition, at 79-80.

The Grand Rapids ERT, and the St. Louis County ERT, approached the school from different positions. See, Lehman Deposition, at 66-67. The team leaders, which included Mettler and Zebro, determined that the Grand Rapids ERT, and the St. Louis County ERT, would enter the building from opposite ends, and would proceed toward the main lobby, clearing and securing areas as they progressed. See, Mettler Deposition, at 17. Once the teams met in the lobby area, they were then to proceed, together, toward the area in which they believed the hostages were being held. See, Affidavit of Joseph Zebro, at ¶10 ("Zebro Aff."). The team leaders determined that the St. Louis County ERT would come in from the northwest portion of the building. See, Mettler Deposition, at 17. It appears that none of the St. Louis County ERT entry team members had been to the Reif Center before. See, Mettler Deposition, at 10-11; Zebro Deposition, at 14, 43-44; Deposition of Timothy Peterson, at 42, Ex. R to Affidavit of John D. Undem ("Peterson Deposition"); Akerson Deposition, at 9; Cuffe Deposition, at 55-56. Further, it appears that none of them were aware of that the Reif Center existed, or that it was a part of the high school building. See, Mettler Deposition, at 12; Zebro Deposition, at 14, 43-44; Peterson Deposition, at 42; Akerson Deposition, at 20, 45; Cuffe Deposition, at 17-18, 55-56.

When the training scenario began, at approximately 10:00 o'clock a.m., the teams first tended to the downed officer, who was located in the parking lot outside the school. See, Zebro Affidavit, at ¶12. At that time, hostage takers were already firing shots inside and outside of the school building. Id. Miskovich testified that she had heard gunfire in the Reif Center, at some point. Miskovich Deposition, at 25. Once the teams treated the downed officer, they proceeded to the next phase of the exercise, which was to enter the high school. The St. Louis County ERT entry team, which included Cuffe, Hohman, Mettler, Peterson, Scott, and Zebro, went around the back side of the high school, in order to gain entry to their portion of the building, which was supposed to be the portion directly adjacent to the the Reif Center. See, Zebro Aff., at ¶15.

Akerson was assigned to the inner perimeter, along with Heinrich, and they went to the outer edge of the high school, which appears to be one of the walls on the back side of the Reif Center. See, Heinrich Deposition, at 23-24; Akerson Deposition, at 16-20. The entry team came around the back side of the building, to where Akerson and Heinrich had set up their perimeter position. See, Heinrich Deposition, at 25; Zebro Deposition, at 20; Akerson Deposition, at 17-18. The entry team, and Akerson, were all wearing their field uniforms, which were comprised of camouflage fatigues,

with Sheriff's Department patches on the shoulders, and were carrying field equipment, including inoperable weapons.[5] See, Ex. 1 to Zebro Aff. At 10:21 o'clock a.m., the entry team was in position. See, Handwritten Log of St. Louis County ERT Actions, Ex. CC to Affidavit of John D. Undem ("St. Louis County ERT Log"); see also, Lehman Deposition, at 22-23. At 10:23 o'clock a.m., it appears that the Command Center radioed the entry team, and advised them that the Grand Rapids ERT was in position. See, St. Louis County ERT Log. At 10:25 o'clock a.m., both entry teams were advised to enter the building. Id.

Shortly after the training exercise began, Lehman became aware that law enforcement personnel were encountering individuals, on the campus, including students coming for activities and delivery persons, who were not involved in the scenario, and who were unaware of the exercise.[6] See, Report Prepared by Randall Lehman,

---

[5]Most of the individuals at the Reif Center, including Miskovich, Wilson, Schafroth, and Lien, claim that the St. Louis County ERT team was not identifiable, either by verbal warning, or visually, as police officials. See, Miskovich Deposition, 21; Schafroth Deposition, at 49; Wilson Deposition, at 33; Lien Deposition, at 16. Miskovich does, however, recall that one of the officers did say something to the effect of "oh, we're cops," but she did not believe the officer because he had just previously been using profanity with the women. Miskovich Deposition, at 31.

[6]In his deposition, Lehman testified that he was not certain whether the individuals were, or were not, aware that the exercise was occurring, or whether they just simply were not involved. See,
(continued...)

Ex. DD to Aff. of John D. Undem ("Lehman Report"). In spite of this information, Lehman did not instruct his team to discontinue the training exercise, and he did not inform the entry team that there were people who were not aware of the training exercise. See, Lehman Deposition, at 20-21.

Initially, the entry team entered the school through a door which was later identified as an entrance to the Reif Center. As the team made a partial initial entry, the team leaders determined that they may not have been in the right place, and Zebro radioed to the Command Center, at 10:27 o'clock a.m., that they may have entered the wrong door, and that they were readjusting. See, St. Louis County ERT Log; Zebro Aff. at ¶15. Thereafter, Mettler and Zebro conversed about the appropriate entry, and tried some other doors, which were found to be locked.[7] See, Mettler Deposition, at 19, 21-23; Lehman Report; Report Prepared by Joseph Zebro, Ex. FF to Aff. of John D. Undem ("Zebro Report"); Zebro Affidavit, at ¶16. Then, they determined that the initial door, that they had attempted to enter, must have been the correct one. See, Mettler Deposition, at 23; Zebro Report; Zebro Affidavit, at ¶20. They entered

[6](...continued) Lehman Deposition, at 30-31.

[7]It appears that one of the doors, which was locked, was the door depicted on the floor plan, as the door the team had originally intended to enter. See, Valley Deposition, at 54-56.

the door, and the team split up, with Cuffe, Hohman, and Mettler, moving to secure the rooms that the Plaintiffs were occupying. See, Mettler Deposition, at 23-25; Hohman Deposition, at 18; Cuffe Deposition, at 39-40. Peterson, Scott, and Zebro, proceeded down the hallway. See, Zebro Deposition, at 28; Peterson Deposition, at 22; Scott Deposition, at 34.

At that time, the Plaintiffs were all working at the Reif Center, in the observation room, or in an adjoining office. See, Wilson Deposition, at 27. Schafroth testified that she saw a man, in camouflage, walk past the doorway towards the outside door, and that she thought he might be in the wrong place. Schafroth Deposition, at 31. Miskovich also noticed men in camouflage. Miskovich Deposition, at 17. Although she did not initially see the men, Wilson contends that she heard Schafroth state that there were "guys runnin' around out here with guns." Wilson Deposition, at 27.

Schafroth then went to look in the hallway, where she heard one of the men say to another man, "I think we're in the wrong place." Schafroth Deposition, at 33. Schafroth approached the men, and asked who they were and what they were doing. Id. at 35; Miskovich Deposition, at 18. One of the men in fatigues told her to "never you mind," while raising his hand, palm forward. Schafroth Deposition, at 35. Schafroth also testified that the man

seemed confused, and she assumed that he was telling her to back off, while he got things figured out. Id.

Consequently, Schafroth returned to the observation room. Id. at 36. She picked up a telephone in order to call Marty in the Reif Center's main office. Id. at 39. She recalled that she was not scared at that point, and she told Marty that there were men in the hallway with guns. Id. at 42. She explained that someone then put a bunker shield, and a gun in her face, and shouted at her to put the phone down. Id. at 44. She exchanged words with the men -- at least two men were reportedly in the observation room -- at which time both she, and the men, were using profane language.[8] Id. at 46. When she would not put the telephone down, it was, allegedly, ripped from her hands, and she was pushed to the center of the room. Id. at 47. She also testified that there was a lot of yelling going on. The men pushed her to the ground, patted her, and then said "You're done." Id. at 50. She thought, at that point, that she must have been involved in a mixed-up training

[8]The St. Louis County entry team denies using, or hearing, any vulgar language having been exchanged between the men and the women, see, Mettler Deposition, at 25; Zebro Deposition, at 28; Peterson Deposition, at 23; Hohman Deposition, at 14, 19; Scott Deposition, at 34; Cuffe Deposition, at 43, but, as we are considering Motions for Summary Judgment, we must take the facts in a light most favorable to the non-moving parties -- here, the Plaintiffs' -- and we will assume that the officers were as vulgar as the Plaintiffs have described them.

scenario. Id. at 51. She testified that the men were angry, and that, when she attempted to advise Wilson, and Schafroth, who were in the adjoining office, that everything was okay, she was restrained from doing so. Id.

Miskovich remembered seeing the men in the hallway, and she believed that, when asked by Schafroth whether they needed any help, one of the men commented that they were just playing "f**king games." Miskovich Deposition, at 18. Miskovich testified that, at that point, she believed something was wrong. Id. at 18-19. Thereafter, Miskovich ran from the observation room into the office, where she told Wilson to get under the desk, and hid herself under the desk. Id. at 27; Wilson Deposition, at 28. A man then came into the room, and stated "I have two more back here, I need help." Miskovich Deposition, at 27; Wilson Deposition, at 32. Two more men came into the office, and said, "We know you're back here. Get out." They were also yelled profanities. See, Miskovich Deposition, at 27; Wilson Deposition, at 32. Miskovich has claimed that she asked one of the officers who they were, but that she did not receive an answer. Miskovich Deposition, at 28; see also, Wilson Deposition, at 33.

Both Miskovich, and Wilson, got onto the floor at the officers' direction, and one of the men placed his foot on Miskovich's back, with his gun pointed at her head. See, Miskovich Deposition,

at 28; Wilson Deposition, at 33. The man with his foot on Miskovich's back did not cause Miskovich any physical pain, or bruises. See, Miskovich Deposition, at 31. Another man, who was in the hallway, yelled that help was needed out there. Both women heard an argument, and the sounds of a struggle, from the hallway, and somebody -- identified by Wilson as Marty -- saying "they're not involved, they're not involved." Miskovich Deposition, at 32; Wilson Deposition, at 34.

At some point, apparently when the man restraining her was distracted by the scuffle in the hallway, Miskovich got off the ground, and started to leave, but was told to "F***ing stop." Miskovich Deposition, at 34. She was escorted back, and she asked the man what he was doing, or what he wanted, but again, she received no response. Id. As for Wilson, she explained that one of the men touched her, and said "you're done," and then repeated it to her. Wilson Deposition, at 35. She testified that the man did not seem angry, and that the touch was not violent. Id. at 38.

The recollections of these events by Cuffe, Hohman, and Mettler, are far different than those of the women, see, Mettler Deposition, at 23-26; Hohman Deposition, at 18-22; Cuffe Deposition, at 39-48, but, for the purposes of these dispositive Motions, we take the facts in the light most favorable to the non-moving party -- the Plaintiffs. Nevertheless, Hohman testified that he thought all

of the women appeared genuinely surprised, and Cuffe remembered that the woman, who was hiding under the desk, appeared to be afraid. Hohman Deposition, at 15; Cuffe deposition, at 42. In fact, according to the reports that have been prepared by Cuffe, Hohman, Peterson, and Scott, soon after the incident, following the first interaction with one of the women, the team leaders made "an initial determination * * * that th[o]se parties perhaps were not advised of our presence for the training scenario." Report Prepared by Timothy Peterson, Ex. GG to Affidavit of John D. Undem ("Peterson Report"); see also, Report Prepared by Ronald Hohman, Ex. HH to Affidavit of John D. Undem ("Hohman Report")("At this time our team leaders, Joe Zebro and Bernie Metler [sic], decided that * * * th[o]se females may not be part of the scenario."); Report Prepared by Michael A. Scott, Ex. II to Affidavit of John D. Undem ("Scott Report")("At this time there was a decision made by Team Leaders Joe Zebro and Bernie Mettler that we were possibly in the wrong part of the school and that th[o]se people may not be involved in the scenario."); Report Prepared by Jerry Cuffe, Ex. KK to Aff. of John D. Undem ("At this time, entry team m[embers] had their weapons drawn and pointed at occupants of the school, and there was an initial determination made by team leaders present, Deputies Joe Zebro and Bernie Mettler, that th[o]se parties perhaps were not advised of our presence for the training scenario.").