After receiving the call from Schafroth, which was cut short by the officer who stormed the room in which she was located, Marty left his office, but did not tell his assistant, Lien, to call 911. See, Lien Deposition, at 14. Thereafter, as Peterson, Scott, and Zebro, were proceeding down the hallway, a male -- Marty -- came around a corner, and began advancing toward them in the hallway. See, Zebro Deposition, at 29; Peterson Deposition, at 24; Scott Deposition, at 36. Peterson and Scott pointed their weapons at Marty, and began shouting commands that he stop and comply with their orders. Peterson Deposition, at 24; Scott Deposition, at 36. Marty refused to do so, and instead, began yelling at the officers, and telling them to get the "f**k" out of the building. Peterson Deposition, at 24; Scott Deposition, 36. Scott and Peterson pushed Marty up against the lockers, and were bringing him under control, when Zebro moved up and began speaking with Marty. See, Zebro Deposition, at 30. Either Zebro, or Scott, asked Marty whether he was aware that a training exercise was in progress, to which Marty replied that he was not. See, Zebro Deposition, at 30; Scott Deposition, at 38. Zebro testified that he then apologized to Marty, and to the Plaintiffs, and allowed them to leave the building unescorted. Zebro Deposition, at 29-32. The Plaintiffs have denied that any apology was given.

According to the Plaintiffs, once they were secured in the Reif Center observation room, and office, they were escorted out of the building, and were led, at gun point, to a grassy area behind the Reif Center. See, Schafroth Deposition, at 54; Wilson Deposition, at 41-42. Akerson confirmed that the three women did exit the building, although he testified that they were not escorted and, since he assumed that they were a part of the scenario, he started issuing commands, such as telling them to keep their hands up. Akerson Deposition, at 22. Akerson did have his gun pointed at them. Id. at 39. They were led to a female Reserve Officer, who told them to sit on the ground. See, Schafroth Deposition, at 55; Miskovich Deposition, at 35; Wilson Deposition, at 43. The Reserve Officer was apparently Akerson's partner, Heinrich. See, Akerson Deposition, at 22; Heinrich Deposition, at 21-22, 26. Heinrich reported that Akerson had told her to keep her gun on the women, and that the women appeared upset. Heinrich Deposition, at 26-28. Neither Schafroth, Miskovich, nor Wilson, specifically recalled Heinrich having a gun, however. See, Schafroth Deposition, at 56; Miskovich Deposition, at 42; Wilson Deposition, at 43.

After directing the women toward Heinrich, Akerson saw a male leave the building, who was yelling "they weren't f**king involved." Akerson Deposition, at 40; Report Prepared by Jason Akerson, Ex. JJ to Aff. of John D. Undem ("Akerson Report").

Otherwise, Akerson testified that no one came out of the building, and advised him that the women were not involved in the scenario. Id. At some point thereafter, the Plaintiffs were released.

After the confrontation with the Plaintiffs, and Marty, one of the team members radioed the occurrence of the encounter to the Command Center, and advised, in specifics, that the team had encountered three females, and a male, who were administrative personnel, and who appeared to be unaware of the training scenario. See, St. Louis County ERT Log. The Command Center received the call at 10:30 o'clock a.m. Id.

On the basis of this Record, the Plaintiffs have asserted the following claims against St. Louis County, Akerson, Cuffe, Hohman, Lehman, Mettler, Peterson, Scott, Zebro, and Grand Rapids: a claim under Title 42 U.S.C. §1983 for violation of their rights under the Fourth and Fourteenth Amendments, as well as claims, under State law, for an intentional infliction of emotional distress, a negligent infliction of emotional distress, assault, battery, and false imprisonment. See, Amended Complaint, Civ. No. 00-1944 [Docket No. 28]; Second Amended Complaint, Civ. No. 01-824 [Docket No. 9]. Miskovich has also sued the Reif Center, and Marty, for both a negligent and an intentional infliction of emotional distress. See, Amended Complaint, Civ. No. 00-1944. Additionally, St. Louis County, Akerson, Cuffe, Hohman, Lehman, Mettler, Peterson, Scott, and

Zebro, have sued the Reif Center, and Marty, for contribution, in the case commenced by Schafroth and Wilson, claiming that, if the Defendants are found liable, on any of the claims asserted by Schafroth and Wilson, it would be because the Reif Center, and Marty, had failed to warn the Plaintiffs about the training scenario. See, Third-Party Complaint, Civ. No. 01-824 [Docket No. 10]. All of the Defendants, and Third-Party Defendants, now seek Summary Judgment on each of the claims, and the Plaintiffs seek leave to amend their respective Complaints.

## III. Discussion

St. Louis County, Grand Rapids, and the individually named officers, seek Summary Judgment based on a variety of immunity defenses, while the Reif Center, and Marty, seek the same relief on the Plaintiffs' claims of a negligent infliction of emotional distress. First, we outline the standard of review which governs our analysis, and then address the Motions individually.

A. Standard of Review. Summary Judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury in weighing the evidence, and in rendering credibility determinations. See, Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). Summary Judgment is appropriate when we have viewed the facts, and the inferences drawn from those facts, in a

light most favorable to the nonmoving party, and we have found no triable issue. See, Duffy v. McPhillips, 276 F.3d 988, 991 (8th Cir. 2002); Schoolhouse, Inc. v. Anderson, 275 F.3d 726, 728 (8th Cir. 2002); Krentz v. Robertson Fire Protection Dist., 228 F.3d 897, 901 (8th Cir. 2000); Curry v. Crist, 226 F.3d 974, 977 (8th Cir. 2000); Carter v. St. Louis Univ., 167 F.3d 398, 400 (8th Cir. 1999). For these purposes, a disputed fact is "material" if it must inevitably be resolved, and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable Jury could return a Verdict for the nonmoving party. See, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Herring v. Canada Life Assurance Co., 207 F.3d 1026 (8th Cir. 2000); Austin v. Minnesota Mining and Mfg. Co., 193 F.3d 992, 995 (8th Cir. 1999); Liebe v. Norton, 157 F.3d 574, 578 (8th Cir. 1998); Peter v. Wedl, 155 F.3d 992,996 (8th Cir. 1998).

As Rule 56(e) makes clear, once the moving party files a properly supported Motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute. In sustaining that burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial." Rule 56(e), Federal Rules of Civil Procedure; see also,

Anderson v. Liberty Lobby, Inc., supra at 256; Allen v. Entergy Corp., 181 F.3d 902, 904 (8th Cir. 1999); Jauregui v. Carter Mfg. Co., 173 F.3d 1076, 1085 (8th Cir. 1999). Moreover, the movant is entitled to Summary Judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, supra at 322; see also, Hammond v. Northland Counseling Center, Inc., 218 F.3d 886, 891 (8th Cir. 2000); Greer v. Schoop, 141 F.3d 824, 826 (8th Cir. 1998). No genuine issue of fact exists in such a case, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, supra at 323; see also, Bell Lumber and Pole Co. v. United States Fire Ins. Co., 60 F.3d 437, 441 (8th Cir. 1995); McLaughlin v. Esselte Pendaflex Corp., 50 F.3d 507, 510 (8th Cir. 1995); Settle v. Ross, 992 F.2d 162, 163 (8th Cir. 1993).

B. Legal Analysis.

1. The Motions of St. Louis County, Akerson, Cuffe, Hohman, Lehman, Mettler, Peterson, Scott, and Zebro, for Summary Judgement, and the Counter Motion of the Plaintiffs to Amend their Complaints.

St. Louis County, and the St. Louis County ERT team, move for Summary Judgment on the Plaintiffs' Federal causes of action, by asserting that the claims are barred by Monell v. Department of

Social Servs., 436 U.S. 658 (1978), and the doctrine of qualified immunity. Further, they contend that the State causes of action -- negligent and intentional infliction of emotion distress, assault, battery, and false imprisonment -- are barred by the doctrines of official immunity, vicarious official immunity, and statutory immunity, under Minnesota Statutes Section 466.03, Subdivision 6. Finally, Peterson, and Scott, claim that, since they had no contact with the Plaintiffs, they cannot be liable for any injuries. We first address the asserted defenses to the Federal cause of action, and then turn to the State causes of action.

a. The Plaintiffs' Federal Claims Under Section 1983.

The Plaintiffs claim that St. Louis County, and the St. Louis County ERT members, deprived them of their rights, under the Fourth Amendment, to be secure from unreasonable search and seizure, and from excessive use of force. As a consequence, they have brought this action under Section 1983.

Insofar as the Plaintiffs' claims relate to St. Louis County, it is clear that they can not sustain their action. It is well settled that, under Monell v. Department of Social Servs., supra at 691, a County "cannot be held liable solely because it employs a tortfeasor -- or, in other words, a [County] cannot be held liable under §1983 on a respondeat superior theory." Of course, the gov-

ernmental entity may be held liable, under Section 1983, if the execution of its policy, or custom, resulted in a deprivation of a constitutional right. Id. at 694; see also, McMillian v. Monroe County, 520 U.S. 781, 783 (1997)(determining that a County is liable, under Section 1983, for the actions of its Sheriff which constitute County policy); Yellow Horse v. Pennington County, 225 F.3d 923, 928 (8th Cir. 2000)("[A] municipality may only be held liable for constitutional violations which result from a policy or custom of the municipality"); McGautha v. Jackson County, 36 F.3d 53, 56 (8th Cir. 1994)("Respondeat superior does not apply under section 1983 because municipal liability is limited to conduct for which the municipality is itself actually responsible.").

Here, however, the Plaintiffs' Complaints are devoid of any allegation that a policy or custom, of St. Louis County, caused the Plaintiffs' injuries, nor have the Plaintiffs proffered any evidence of such a policy or custom. Thus, it is clear that their causes of action, against St. Louis County, cannot survive, and we grant St. Louis County's Motion for Summary Judgment on the Plaintiffs' Section 1983 claims.

As to the individually named St. Louis County ERT members, they first argue that the Plaintiffs have not sued them in their individual capacities, and that, therefore, the Section 1983 claims must be dismissed. At the outset, we note that the Plaintiffs have

agreed that Peterson, and Scott, did not have any direct contact with the Plaintiffs during the events of July 14, 1999, see, Peterson Deposition, at 22-25; Scott Deposition, at 34-39, and as a result, they concede that a dismissal of the Section 1983 claim, as against those two Defendants, is warranted. See, Plaintiffs' Memorandum in Response to St. Louis County, et al.'s Motion for Summary Judgment, at 26. Therefore, we grant Summary Judgment to Peterson, and Scott, on the Plaintiffs' Section 1983 claims.

Although the Plaintiffs can sue the remaining, individually named St. Louis County officers, in either their official and/or their individual capacities, see, Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999), under Section 1983, a suit against an officer in his official capacity is construed as a suit against the governmental entity -- in this case, against St. Louis County. See, Reehten v. Buck, 163 F.3d 602, 1998 WL 738329 at *1 (October 23, 1998)("[The plaintiff's] official-capacity action against the three defendants amounts to an action against their municipal employer, St. Louis County.")[Table Decision]; Doe v. Washington County, 150 F.3d 920, 923 (8th Cir. 1998)("A suit against a county official in his official capacity is the equivalent of a suit against the county itself.").

As we have already observed, however, a governmental entity, such as a County, can only be sued under Section 1983 for its un-

constitutional policy, or custom. See, Monell v. Department of Social Servs., supra at 694; see also, Reehten v. Buck, supra (construing Complaint, that did not specify whether officers were sued in their official or individual capacity, as an official capacity Complaint, and affirming the dismissal of the Complaint because it failed to plead an unconstitutional policy or custom); Lopez-Buric v. Notch, 168 F.Supp.2d 1046, 1049 (D. Minn. 2001)("[A] §1983 suit against the governmental entity employer is considered to be a Monell claim."). Therefore, unless the officers have been sued in their individual capacities, the Section 1983 claims must be dismissed because of the Plaintiffs' failure to allege an unconstitutional policy or custom. See, Lopez-Buric v. Notch, supra at 1049.

As our Court of Appeals has often held, "in order to sue a public official in his or her individual capacity, a plaintiff must expressly and unambiguously state so in the pleadings, otherwise, it will be assumed that the defendant is sued only in his or her official capacity." Johnson v. Outboard Marine Corp., supra at 535, and cases cited therein; see also, Egerdahl v. Hibbing Comm. College, 72 F.3d 615, 619 (8th Cir. 1995)("If a plaintiff's complaint is silent about the capacity in which she is suing the defendant, we interpret the complaint as including only official-capacity claims."). Moreover, the Court has plainly placed litiga-

tors on notice as to how to properly plead the individual capacity of a State actor, by instructing that "Section 1983 litigants wishing to sue government agents in both capacities should simply use the following language: 'Plaintiff sues each and all defendants in both their individual and official capacities.'" Nix v. Norman, 879 F.2d 429, 431 (8th Cir. 1989). "This is not a burdensome requirement * * *." Lopez-Buric v. Notch, supra at 1050. The requirement is necessary in order to place defendants on notice that they are being sued in their personal capacity. See, Johnson v. Outboard Marine Corp., supra at 535.

Nonetheless, "when a complaint is otherwise sufficient to put governmental officials on notice that they are being sued personally, the Eighth Circuit has permitted the plaintiff's individual capacity claims to proceed." Helseth v. Burch, 109 F. Supp.2d 1066, 1073 (D. Minn. 2000), rev'd on other grounds, 258 F.3d 867 (8th Cir. 2001), citing Jackson v. Crews, 873 F.2d 1105, 1107 (8th Cir. 1989). In Helseth, the Court went on to analyze the Complaint, in order to determine whether it placed the defendants on notice, even though the caption of the Complaint did not specifically state that the defendants were being sued in their individual capacities. In particular, the Court noted that the plaintiff structured his Complaint in such a way that the "only reasonable interpretation of it is that it asserted claims against [the

defendant] in his individual capacity." Id. at 1074. Specifically, the plaintiff separated the claims he had between the individual official, and the municipality, and only claimed punitive damages against the individual official, which was notable because punitive damages could not be claimed against governmental agencies. Id. at 1073, citing City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271 (1981). Moreover, the Court noted that the individual defendant must have known that he was being sued in his individual capacity, as he retained separate counsel. Id. at 1074.

None of the factors, which were recognized in Helseth, as disclosing an intent to plead claims against the defendants individually, are present here. The Complaints do not unambiguously state that the individual Defendants were being sued in either their official or individual capacities and, beyond initially identifying the Defendants, the Complaints do not differentiate between St. Louis County, Grand Rapids, or the separately named St. Louis County Defendants. See, Amended Complaint, Civ. No. 00-1914; Second Amended Complaint, Civ. No. 01-824. For the most part, the Complaints consistently identify the separately named St. Louis County Defendants as "employees," or they denote them as "defendant law enforcement officers." See, Amended Complaint, at ¶¶VI-VII, XII-XV, Civ. No. 00-1944; Second Amended Complaint, at ¶¶IV-V, IX-XII, Civ. No. 01-824. Finally, there is no claim for punitive damages

in these actions, which could have been placed the Defendants on notice that they were being sued in their individual capacities. See, Lopez-Buric v. Notch, supra at 1050 (noting the language used in the Complaint, and the fact that the plaintiff did not pursue punitive damages, demonstrated that the complaint only evidenced a suit against the defendant in his official capacity). Thus, we conclude that the Complaints did not "expressly and unambiguously" place the Defendants on notice of their potential personal liability.

Here, however, the Plaintiffs have filed a Motion to Amend their Complaints, so as to assert, clearly, a claim against the Defendants in their individual and official capacities. We conclude that, under the circumstances of this case, we are well within our discretion to grant the Plaintiffs' Motions to Amend the Complaint. See, e.g., Murphy v. Arkansas, 127 F.3d 750, 755 (8th Cir. 1997). In Murphy, our Court of Appeals concluded that the plaintiff's complaint contained "no * * * clear statement" that the officials were being sued in both their individual and official capacities. Id. at 754. There, the defendants filed a Motion for Summary Judgment, based upon the Eleventh Amendment, and the plaintiff responded with a Motion to Amend. Id. The District Court did not rule on the Motion to Amend, but denied the defendants' Motion for Summary Judgment, stating that the "defendants cannot seriously

argue that they had no notice that they were sued in [their] individual capacities." Id. at 754-55. On appeal, the Court upheld the denial of Summary Judgment, reasoning as follows:

> Though the district court erred in excusing Murphy's failure to clearly assert personal capacity claims in his initial complaint, that does not resolve the issue. When defendants sought summary judgment on this ground, Murphy moved to amend his complaint. The district court has not ruled on that motion, which is committed to its sound discretion. See Nix [v. Norman], 879 F.2d at 433, n.3. Given the district court's conclusion that defendants had sufficient notice they were being sued in their personal capacities, we are confident that the district court would grant Murphy leave to amend the complaint to state personal-capacity * * * claims.

Id.

We similarly conclude that, notwithstanding the absence of expressly designated individual capacity claims, the Defendants were on notice that they were being sued in their individual, and official capacities. In their Answer to both Complaints, St. Louis County, and the specifically named St. Louis County ERT officers, pled qualified immunity as a defense against the constitutional claims. See, Answer, at 3-4, Civ. No. 00-1944 [Docket No. 29]; Amended Answer, at 3, Civ. No. 01-824 [Docket No. 2]. However, if these Defendants had been sued only in their official capacities, then the defense of qualified immunity would be unavailable to them, as "[q]ualified immunity is not a defense available to governmental

entities, but only to government employees sued in their individual capacities." Johnson v. Outboard Marine Corp., supra at 535; see also, Helseth v. Burch, supra at 1074 (noting that the defendant "focuse[d] his defense on the doctrine of qualified immunity"). Moreover, there is nothing in the Defendants' respective Answers which would alert the Plaintiffs, that the Defendants believed that they were only being sued in their official capacities. See, Lopez-Buric v. Notch, supra at 1051 (noting that defendant's answer to the Complaint asserted that the defendant "was acting in his official capacity at all times relevant hereto, and all claims asserted against the municipal defendants are official capacity claims").

Finally, we note that these Defendants have admitted that there would be no prejudice if we were to allow the Plaintiffs to amend their Complaints. There is no suggestion that the proposed amendment would cause additional discovery to be taken, and although the St. Louis County Defendants did intimate a potential conflict of interest between Lehman, and the other St. Louis County ERT members, St. Louis County confirmed that there was no question that the County would indemnify the officers.[9] Therefore, we

---

[9]Any potential conflict of interest between Lehman, and the other officers, is resolved by our grant of Lehman's Motion for Summary Judgment, as we later explain in the text of this Order.

conclude that, on this Record, the Plaintiffs' Motions to Amend should be granted, which will cure their failure to specifically allege the claims against the officers, in both their individual and official capacities. Conversely, we deny the Motions of Akerson, Cuffe, Hohman, Lehman, Mettler, and Zebro, for Summary Judgment on the Section 1983 claims, on lack of individual capacity grounds.

Lastly, Akerson, Cuffe, Hohman, Lehman, Mettler, and Zebro, contend that the Plaintiffs' claims against them, under Section 1983, must be dismissed, as they are entitled to qualified immunity. Government officials, who are performing discretionary functions, are generally shielded from liability for civil damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. See, Wilson v. Layne, 526 U.S. 603, 609 (1999); Young v. Harrison, 284 F.3d 863, 866 (8th Cir. 2002); Winters v. Adams, 254 F.3d 758, 766 (8th Cir. 2001). In order "[t]o withstand a claim of qualified immunity at the summary judgment stage, a plaintiff must assert a violation of constitutional or statutory right; that right must have been clearly established at the time of the violation; and given the facts most favorable to the plaintiff, there must be no genuine issue of material fact as to whether a reasonable officer would have known that alleged action indeed violated that right."

Mettler v. Whitledge, 165 F.3d 1197, 1202 (8th Cir. 1999); see also, Young v. Harrison, supra at 866-67.

"[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in the light of the legal rules that were 'clearly established' at the time it was taken." Wilson v. Layne, supra at 614. The contours of the constitutional right at issue "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right," but "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in light of pre-existing law, the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 641 (1987). Thus, "[t]he doctrine 'gives ample room for mistaken judgments but does not protect the plainly incompetent or those who knowingly violate the law.'" Bagby v. Brondhaver, 98 F.3d 1096, 1098 (8th Cir. 1996).

Here, the Plaintiffs argue that their rights, which were violated by the Defendants, and which were clearly established at the time of the incident, were the right against unlawful seizure, as guarded by the Fourth Amendment, and their right to be free from excessive use of force, as also protected by the Fourth Amendment.

Although the Defendants respond, that these rights were not clearly established in the context of a case such as the one at hand, we cannot agree.

Our Court of Appeals has conclusively determined, well before the incident at issue in this case, that "'whenever a police officer accosts an individual and restrains his freedom to walk away, he has seized that person * * * and the Fourth Amendment requires that the seizure be reasonable." Fields v. City of Omaha, 810 F.2d 830, 834 (8th Cir. 1987). More recently, the Court reaffirmed, that a person is "seized" when police engage "in conduct that would make a reasonable person feel he was not free to leave." Mettler v. Whitledge, supra at 1203, and cases cited therein. Such a seizure, assuming it is not predicated on probable cause, is reasonable if it is founded upon a reasonable suspicion, id., or, as more recently determined, upon a "community caretaking function."[10] Winters v. Adams, supra at 764. There is no contention that probable cause, reasonable suspicion, or community caretaking, was present

---

[10]The "community caretaking" function appears to be an alternative to the requirement of reasonable suspicion established in Terry v. Ohio, 392 U.S. 1, 20-22 (1968). See, Winters v. Adams, 254 F.3d 758, 766 (8th Cir. 2001). In Winters, the Court determined that, under certain circumstances, apart from detection, investigation, or the collection of evidence relating to a crime, officers can conduct a limited stop of an individual "'in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity.'" Id. at 763, quoting United States v. King, 990 F.2d 1552, 1560-61 (10th Cir. 1993).

here and, taking the facts in a light most favorable to the Plaintiffs, there can be no doubt that the women felt they were in police custody -- not free to leave -- when they were confronted by Cuffe, Hohman, Mettler, and Zebro. On these facts, assumed in a light that favors the Plaintiffs' contentions, there can be no responsible contention that the Plaintiffs' right against an unreasonable seizure was not clearly established at the time of the July 14 incident.

Moreover, as our Court of Appeals clearly stated, in January of 1999, "[t]he Fourth Amendment protects citizens from being seized through excessive force by law enforcement officers," a precept that was established by the Supreme Court in 1989. Mettler v. Whitledge, supra at 1202, citing Graham v. Connor, 490 U.S. 386, 395 (1989). The test for determining whether force was excessive is "whether the amount of force used was objectively reasonable under the particular circumstances." Winters v. Adams, supra at 766, quoting Greiner v. City of Champlin, 27 F.3d 1346, 1354 (8th Cir. 1994). The factors, which must be considered in determining the presence of excessive force, include "the severity of the suspected crime, whether the suspect posed an immediate threat to the officer or others, and whether the suspect was actively resisting arrest." Goff v. Bise, 173 F.3d 1068, 1073 (8th Cir. 1999). Of course, "this generalized right to be free from an unreasonable use

of excessive force during a police seizure does not clearly establish a right for purposes of a qualified immunity analysis." Winters v. Adams, supra at 1202-03. Rather, a plaintiff "must show the right was clearly established in a particularized sense relevant to the case at hand." Id. at 1203.

Construing, as we must, the facts in favor of the Plaintiffs, the particular circumstances of this case show that Cuffe, Hohman, Mettler, and Zebro, without probable cause, reasonable suspicion, or some other lawful basis, seized the Plaintiffs and, in doing so, used weapons, a bunker shield, physical touching, and commands to effectuate the seizure. While we understand these Defendants to contend, that they believed that they had the implied consent of the individuals to conduct the seizures, and exercise the force complained of here, we cannot say that the evidence would not support the Plaintiffs' theory, that these officers determined, prior to accosting the Plaintiffs, that they were not in the correct building, and that the women did not know about the training. According to the Plaintiffs, despite these realizations, the officers, for reasons known but to them, decided to treat the Plaintiffs as though they were actors in the exercise scenario.

Of course, for these purposes, we need not find -- and we do not find -- that the officers had any ill-will toward the Plaintiffs, by the actions that the officers took on July 14. The

Record before us could as easily -- or, perhaps, more easily -- support the officers' contention, that the best laid of plans went miserably awry, and that they innocently, but wrongly, believed that the Plaintiffs were a part of the training scenario. Cf., Robert Burns, To a Mouse (1785). No matter how implausibly, however, we might regard the Plaintiffs' theory to be -- namely, that the officers purposefully violated their Fourth Amendment rights, as an act of tyranny, if not of testosterone gone mad,[11] the crux of the issue before us is not one involving the application of law to undisputed facts, but one involving a critical ascertainment of believability.

However, "[a]t the Summary Judgment state, the court should not weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter." Peter v. Wedl, supra at 996, quoting Quick v. Donaldson Co., 90 F.3d 1372, 1376-77 (8th Cir. 1996); see also, Anderson v. Liberty Lobby, Inc., supra at 249 ("[A]t the summary judgment stage the judge's function is not him-

[11] While almost unthinkable, we cannot exclude the possibility, given the testimony of the Plaintiffs, that the officers in question, for fear that the Plaintiffs were a part of the scenario, and that their being duped by them would be a matter of peer derision, or that, having been thoroughly frustrated by the uncertainty posed by their location in an area in which, perhaps, they should not have been, they vented their frustrations upon the Plaintiffs. While we are dubious that a Jury would conclude that such a near unthinkable circumstance occurred, that is the Jury's function, and not ours on Summary Judgment.