self to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."); Hedges v. Poletis, 177 F.3d 1071, 1074 (8th Cir. 1999) ("When evaluating a motion for summary judgment, the court must draw all reasonable inferences in favor of the non-moving party and refrain from assessing credibility."). "[I]n order to defeat a motion for qualified immunity, it need only be permissible for a reasonable finder of fact based on the evidence and on the finder of fact's assessment of witness credibility to conclude that the [alleged violation of the Plaintiffs' Fourth Amendment right] was objectively reasonable." Ribbey v. Cox, 222 F.3d 1040, 1043 (8th Cir. 2000). Accordingly, we deny the Motion for Summary Judgment by Cuffe, Hohman, Mettler, and Zebro, on the basis of qualified immunity, and we proceed to the Motions for the same relief by Akerson and Lehman.

As to Akerson, and Lehman, we are presented with significantly different facts. Lehman was not involved in, and did not witness or approve, the actual seizure of the Plaintiffs and, in no way, did he employ and direct use of force against them. Moreover, the Plaintiffs have not alleged any other clearly established constitutional, or Federal statutory right, that the Plaintiffs hold, or that Lehman is alleged to have violated. See, Otey v. Marshall, 121 F.3d 1150, 1155 (8th Cir. 1987)(stating, in regard to a claim

against a Chief of Police, which stemmed from a shooting by one of his officers, "[t]o overcome Chief Smith's entitlement to qualified immunity, the appellee must allege, and present evidence that could support, that Chief Smith himself violated a well-established constitutional right of [the plaintiff's]"). In short, "Section 1983 liability cannot attach to a supervisor merely because a subordinate violated someone's constitutional rights." Id. at 1155.

Although the Plaintiffs have not specifically delineated the bases for suing Lehman under Section 1983, they appear to contend that Lehman failed to properly train, or supervise, the entry team. See, Tlamka v. Serrell, 244 F.3d 628, 635 (8th Cir. 2001)(stating that a supervisor is subject to Section 1983 liability only if he directly participated in the constitutional violation or if his failure to train or supervise the offending employee caused a violation of the constitutional right); Otey v. Marshall, supra at 1155. In order to show that Lehman failed to supervise the Defendants, they Plaintiffs must show that Lehman:

> (1) Received notice of a pattern of unconstitutional acts committed by subordinates;
>
> (2) Demonstrated deliberate indifference to or tacit authorization of the offensive acts;
>
> (3) Failed to take sufficient remedial action; and
>
> (4) That such failure proximately caused injury to [the Plaintiffs].

Otey v. Marshall, supra at 1155, quoting Jane Doe v. Special Sch. Dist. of St. Louis County, 901 F.2d 642, 645 (8th Cir. 1990); see also, Audio Odyssey, Ltd. v. Brenton First National Bank, 245 F.3d 721, 742 (8th Cir. 2001).

Here, there has been no evidence, that has been proffered by the Plaintiffs, or any other party, that Lehman had received notice of his officers' propensity to commit unconstitutional acts. Therefore, we conclude that the Plaintiffs have not sustained their burden to divest Lehman of his entitlement to qualified immunity on a failure to supervise claim.

As to a failure to train contention, "'the inadequacy of police training may serve as the basis for §1983 liability only where the failure to train amounts to deliberate indifference to the rights of the persons with whom the police come into contact." Otey v. Marshall, supra at 1156, quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989). Thus, as our Court of Appeals has observed:

> It is necessary to show that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In other words, the plaintiff must demonstrate that the city had notice that it procedures were inadequate and likely to result in a violation of constitutional rights.

Andrews v. Fowler, 98 F.3d 1069, 1076 (8th Cir. 1996)[internal quotations and citations omitted].

Once again, however, the Plaintiffs have made no showing of a deficiency in the training of the members of the St. Louis County ERT team. Therefore, we conclude that Lehman is entitled to qualified immunity, and we grant his Motion for Summary Judgment on the Plaintiffs' Section 1983 claims.

Finally, with respect to Akerson, we will assume that he violated a clearly established right of the Plaintiffs, when he escorted them, at gun point, from the Reif Center to Reserve Officer Heinrich. However, it is clear that a reasonable officer, in Akerson's position, would not have known that he was violating the Plaintiffs' rights. The Plaintiffs have identified nothing in this Record which would so much as suggest that Akerson knew they were not involved in the training scenario. Unlike Cuffe, Hohman, Mettler, and Zebro, Akerson was not a part of the St. Louis County ERT entry team, but rather, was maintaining a post on the inner perimeter of the school. See, Akerson Deposition, at 16. As Akerson explained in his report, his "assignment was to watch for any students or people running from or leaving the building as part of the scenario and to detain th[o]se people." Akerson Report.

As a consequence, Akerson was not involved in the apparent discussion, between Mettler and Zebro, concerning the possible mistaken entry into what they later learned was the Reif Center, or the noninvolvement of the Plaintiffs in the scenario. See, Peter-

son Report; Hohman Report; Scott Report; Cuffe Report. Moreover, when the St. Louis County ERT entry team exited the Reif Center the first time, in order to ascertain the correct entrance, Akerson did not address the situation with them, nor did overhear them engaged in such a discussion, as there is no evidence to the contrary. Even assuming that Akerson heard the radio communication, between the entry team and the Command Center -- in which the entry team advised that they had entered the wrong door,[12] see, St. Louis County ERT Log (log entry at 10:27 o'clock a.m.) -- there is no evidence that there was a conversation about the occupants in the building, or the reason the entry team felt that they had entered the wrong building. On the Record before us, Akerson only saw the entry team leave the building, try other doors, and ultimately decide to reenter the building through the same door. See, Akerson Deposition, at 18.

Nor is there any evidence that, after the women were escorted from the Reif Center, and Akerson trained his gun on them, he was advised by anyone -- either the Plaintiffs or another officer -- that the Plaintiffs were not a part of the scenario. Id. at 40.

[12]Akerson did not know the entry team had communicated with the Command Center, by radio, about the locked door, nor is there any evidence suggesting that he heard the communication, or was forgetful in not recalling that communication. Akerson Deposition, at 18.

Akerson testified that he did not hear anyone from the entry team state that the women were not involved in the scenario, or that the entry team had entered the wrong building. Id. at 42. Akerson was of the mind-set, which is not contradicted by any evidence, that all of the individuals were either involved in the exercise, or were aware of the exercise, and would advise him, that they were not involved, if confronted. Id. at 7.

Consequently, as the Plaintiffs filed out of the building, Akerson reasonably assumed they were part of the exercise, and he treated them as such. We can find nothing objectively unreasonable in these actions, nor could a reasonable fact finder. Thus, we conclude that, even if Akerson violated a clearly established right of the Plaintiffs', a reasonable officer in his position would not have known that he was violating their rights, and he is, therefore, entitled to Summary Judgment based on qualified immunity, and we grant his Motion for Summary Judgment.

b. The Plaintiffs' State Law Claims.

The Plaintiffs assert claims of negligent and intentional infliction of emotional distress, assault, battery, and false imprisonment, against St. Louis County, Akerson, Cuffe, Hohman, Lehman, Mettler, Peterson, Scott, and Zebro. In turn, these Defendants move for Summary Judgment on the grounds that they are

entitled to official immunity, vicarious official immunity, and statutory immunity. In addition, Peterson and Scott contend that they are entitled to Summary Judgment because they had no contact with the Plaintiffs at any time during the training exercise. We agree with the Defendants, but only in part, and we address each of their defenses separately.

1. Official Immunity. First, the separate St. Louis County Defendants urge that they are entitled to official immunity. In Minnesota, governmental employees are entitled to immunity when they are performing discretionary functions. See, e.g, Kuha v. City of Minnetonka, 176 F. Supp.2d 926, 934 (D. Minn. 2001) (applying Minnesota law); Janklow v. Minnesota Bd. of Examiners, 552 N.W.2d 711, 715-16 (Minn. 1996). As government employees, they are "accorded near complete immunity for their actions in the course of their official duties, so long as they do not exceed the discretion granted them by law." Janklow v. Minnesota Bd. of Examiners, supra at 716. Such official immunity is "intended 'to protect public officials from the fear of personal liability that might deter independent action.'" Dokman v. County of Hennepin, 637 N.W.2d 286, 296 (Minn.App. 2001), rev. denied (Minn. February 28, 2002).

As a result, the heart of our analysis, under a claim of official immunity, is the nature of the governmental action; that is,

was the act discretionary or ministerial. "[I]n analyzing any immunity question it is essential to identify the precise governmental conduct at issue." Watson v. Metropolitan Transit Commission, 553 N.W.2d 406, 415 (Minn. 1996). Discretionary decisions are those which involve the exercise of judgment or discretion. See, Johnson v. Morris, 453 N.W.2d 31, 41 (Minn. 1990); Mowatt v. Hennepin County, 2002 WL 857733 at *4 (Minn.App. May 7, 2002) (stating that discretionary acts are those that involve "the exercise of individual judgment in carrying out official duties") [unpublished decision]. In contrast, ministerial decisions, which are the types of decisions that are absolute, certain, and imperative, and involve merely the execution of a specific duty which arises from fixed and designated facts, see, Rico v. State, 472 N.W.2d 100, 107 (Minn. 1991), are not immune to suit. "Some degree of judgment and discretion will not necessarily confer discretionary immunity on an official; the crucial focus is upon the nature of the act." Elwood v. County of Rice, 423 N.W.2d 671, 677 (Minn. 1988).

The categorization of an act as discretionary or ministerial is a legal question, which the Court determines. See, Kelly v. City of Minneapolis, 598 N.W.2d 657, 664 (Minn. 1999). "In making this determination the Court [should] keep[] in mind that official immunity, 'protects public officials from the fear of personal lia-

bility that might deter independent action and impair the effective performance of their duties.'" Kuha v. City of Minnetonka, supra at 934, quoting Elwood v. County of Rice, supra at 677.

Generally, "[a] police officer who performs his or her duty to prevent crime and enforce the law is not * * * acting in a ministerial capacity, but is usually exercising discretion." Kuha v. City of Minnetonka, supra at 934; see also, Watson v. Metropolitan Transit Commission, supra at 415; Johnson v. Morris, supra at 41. Rather, "[o]nly when officials act outside the scope of their charged authority can they be deemed to have waived this immunity and be held personally liable for their negligence." Watson v. Metropolitan Transit Commission, supra at 415. The Court, in Kuha, explained the reasoning for such a rule, as follows:

> Official immunity is provided because the community cannot expect police officers to do their duty and then to second-guess them when they attempt to conscientiously do it. To expose police officers to civil liability whenever a third person might be injured would * * * tend to exchange prudent caution for timidity in the already difficult job.

Kuha v. City of Minnetonka, supra at 934-35.

Here, the Plaintiffs claim that the St. Louis County officers' actions were ministerial, as this was a "training exercise where the officers had previously decided that the Plaintiffs were non-participants," and thus, "[a]t this point the officers' duty becomes ministerial -- they have no reason nor justification for con-

fronting innocent citizens at gunpoint, screaming vulgarities at them and detaining them." Plaintiffs' Memorandum in Response to St. Louis County, et al.'s Motion for Summary Judgment, at 22. Rather, the Plaintiffs argue, "[t]he officers' duty, once a determination was made that Plaintiffs were not involved in the training scenario, was absolute, certain and imperative." Id.

We need not determine whether the actions of Cuffe, Hohman, Mettler, Peterson, Scott, and Zebro, were discretionary, or were ministerial, for purposes of their claim of official immunity, as we conclude that there is a genuine issue of material fact as to whether these officers acted with malice. In addition to the fact, that ministerial decisions are not protected by official immunity, the immunity can also be eviscerated when the plaintiff alleges, and proves, that the official acted willfully and maliciously. See, Kuha v. City of Minnetonka, supra at 934, Kelly v. City of Minneapolis, supra at 663. The Minnesota Supreme Court has stated that willful, or malicious conduct, is the "intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right." Kelly v. City of Minneapolis, supra at 663, quoting Rico v. State, supra at 107. Stated otherwise, "[m]alice in the context of official immunity means intentionally committing an act that the official has reason to believe is legally prohibited." Id. at 664. The question of

malice is an "objective inquiry into the legal reasonableness of an official's actions." Dokman v. County of Hennepin, supra at 298, quoting State by Beaulieu v. City of Mounds View, 518 N.W.2d 567, 571 (Minn. 1998).

As we have previously explained, in the context of certain of the Defendants' claims to qualified immunity, when we view the evidence in a light most favorable to the Plaintiffs, we are unable to find the absence of a genuine issue of material fact as to whether these Defendants acted with malice.[13] Rather, the reports of Cuffe, Hohman, Peterson, and Scott, explain that Mettler, and

[13]We recognize that Scott, and Peterson, were not implicated in our prior discussion concerning the actions of the St. Louis County ERT entry team, and we are mindful that they had requested Summary Judgment based on the fact that they did not interact with the Plaintiffs at any time. See, Peterson Deposition, at 22-25; Scott Deposition, at 34-39. However, as we have already noted, both Peterson, and Scott, reported that there had been a previous decision by Zebro, and Mettler, that the Plaintiffs were either not involved in the scenario, or were unaware of it. See, Peterson Report; Scott Report. Nevertheless, without any apparent questioning of the propriety of treating the women as participants in the training, they went along with their team members, and entered the building. Although they, then, went down the hallway, instead of into the rooms containing the Plaintiffs, we find it disturbing that, if the Plaintiffs version of the facts are accepted as true, Scott and Peterson would not have acted to stop their fellow team mates. Thus, while it is true that they did not directly confront the Plaintiffs, and in no way accosted them, viewing the facts in the light most favorable to the Plaintiffs, we conclude that Scott, and Peterson, had a duty to protect the Plaintiffs, and they failed in that duty. Consequently, we deny their Motion for Summary Judgment, which is based on the fact that they did not have direct contact with the Plaintiffs.

Zebro, made a determination, after the team had initially entered the building that they later learned was the Reif Center, that they were in the wrong building, and that the women in the building were not involved in the training, or were not "advised" of the exercise. See, Peterson Report; Hohman Report; Scott Report; Cuffe Report. Nonetheless, the officers decided to reenter the Reif Center, and treat the women as if they were participants in the exercise. We cannot, on Summary Judgment, discredit the Plaintiffs' assertion, that the decision to reenter the building was an intentional violation of their rights, which would constitute an act of malice so as to foreclose a claim of official immunity. Accordingly, we deny the Motions of Cuffe, Hohman, Mettler, Peterson, and Scott, for Summary Judgment on the basis of qualified immunity.

Once again, however, Akerson and Lehman present a different question. First, as to Lehman, the Plaintiffs assert that he knew that the Reif Center was not a part of the training exercise, and that, therefore, he had a ministerial duty to advise his officers of that fact. Moreover, they argue that, once Lehman became aware, during the initial stages of the training exercise, that individuals, including delivery persons and students reporting for weight lifting training, were not either aware or involved in the train-

ing exercise, see, Lehman Report, he had a ministerial duty to stop the exercise. We cannot agree.

While Lehman certainly realized that the Reif Center was not a part of the scenario, see, Lehman Deposition, at 11, we cannot conclude that he had a ministerial duty to advise his people of that fact. Rather, Lehman, and his officers, were involved in a training exercise which was supposed to simulate events in the most realistic of fashions. Id. at 20. Although the Plaintiffs make much of the fact that this was not a real life situation, but was, rather, a training exercise, we cannot so readily dismiss the seeming reality of the situation. See, e.g., Watson v. Metropolitan Transit Commission, supra at 415 ("[A]n emergency situation need not exist for official immunity to apply."). The incident was directly on the heels of the tragedy at Columbine High School, and the officers, with foreknowledge that a similar tragedy could arise in their own environs, needed to be prepared for that potential. The training in which they engaged was not only reasonable, but it was an unavoidable consequence of their public duty to prepare for the worst. As a result, in order instill reality into the exercise, so as require the participating officers to react to surprise, Lehman was required to parse the information provided to his officers. There is nothing in this Record to so much as suggest that Lehman was attempting to mislead his officers into believing that the Reif

Center was a part of the exercise, and we find no error in his decision to spare the officers some details of the exercise that, as a matter of planning, were never thought would arise.

Further, as Lehman himself explained, he also knew only a limited amount about the scenario, in order to measure his ability to make decisions under exigency. As he testified at his deposition:

> Q. What did [Valley] tell you about the scenario? I want you to give me your best recollection of -- you know, exact words isn't critical, but I'm looking for the extent of knowledge he gave you about what the scenario was to involve.
>
> A. Very little. And that was intentional. We had discussed that at the walk-through on June 15th; that the scenario was designed to not only test individual team members in their response to this hostage situation but also the commanders, and so we weren't given a lot of details.

Lehman Deposition, at 54.

Lehman's role in this training program was to make judgment calls, which starkly contrasts with the type of absolute, conclusive responsibility that generally attends ministerial decisionmaking.

More importantly, the facts here reflect the following: Lehman did know that the Reif Center was not involved in the training exercise, see, id, at 11; he was involved in a walk-through of the Grand Rapids High School almost one month prior to the actual exercise, see, id. at 9; from his walk-through, he did

not have a clear idea about the position of the Reif Center in relation to the school, see, id. at 9, 88; he had no idea that the Reif Center had a separate entrance, and offices, from the high school, see, id. at 12, 85-87; Lehman did not view any maps or schematics of the school prior to the training; see, id. at 93-94; Lehman believed, from discussions with Valley, that any areas which were not involved in the training exercise would be locked, see, id. at 81; and the officers were instructed that they were to conduct no forced entries, see, id. Given these facts, we cannot conclude that Lehman had an absolute, certain, and imperative duty, see, Rico v. State, supra at 107, to advise the team members that the Reif Center was off limits. Rather, his decision as to what information was to be shared with his officers was well within his exercise of broad dis-cretion as the Commander of the St. Louis County ERT.

The second of Lehman's decisions, which the Plaintiffs pin-point, is his election to allow the scenario to proceed, even though he had received a communication from Cuffe, during the scouting mission, which questioned whether construction workers, and students at the site, knew about the scenario, and even though he later learned, just after the exercise began, about individuals who did not know about the scenario. It is important to note, how-

ever, that the latter information did not come from the St. Louis County ERT members.

As to the communication from Cuffe, the Plaintiffs urge us to afford it more substance than it is due. During his scouting maneuver with Akerson, Cuffe noticed that there were construction workers, at or near the school, and he wanted to ensure that they knew about the training. See, Cuffe Deposition, at 20. Cuffe did not know if the construction workers were unaware of the exercise, and he never approached them. Id. at 20-21. Instead, he radioed Lehman, who said he would double check. Id. at 21. Sometime later, prior to the start of the exercise, Lehman confirmed, with Cuffe, that all of the individuals on the campus knew of the training. Id. There is no indication that Lehman did not actually double check this information, or that he lied to Cuffe, when he advised that all on the campus knew about the training. As a result, Cuffe's communication with Lehman has only remote relevance to our analysis.

More pertinent, however, is the alert that Lehman received, shortly into the training exercise, that individuals on the high school campus, including delivery persons and students, appeared to have no knowledge of the exercise. See, Lehman Report. The Plaintiffs contend that, once Lehman received that advisory, he had an

absolute, immutable duty to halt the training exercise. We are not so persuaded.

We are obligated to evaluate Lehman's actions, not in a vacuum, but in the context of the events in which he took those actions. As Lehman explained, the training scenario was not only devised to test his entry team, but also his reaction to the unexpected developments. Lehman Deposition, at 54. Although he was stationed at the Command Center, it was not his sole purpose to receive, and digest, radio communications. Rather, Officer Burns was monitoring the radio communications, which were coming from four or five different radios. Id. at 22. At some point, Lehman did become aware, that there were individuals on the campus, who were, at the least, not involved in the exercise and, at the most, were not aware of the exercise. See, Lehman Report. Lehman then had to decide his "next course of action", based on his knowledge of his team, as well as what he had been told by Valley; namely, that all of the individuals had been notified of the exercise, see, Lehman Deposition, at 35, and that there had been security posted at the entrances to the schools early that morning to advise people of the exercise, see, id. at 14. Moreover, as Lehman testified at his deposition, another factor in his decision was his belief that people would realize something was afoot due to the emergency vehicles in the parking lot of the school. Id. at 35-36.

Based upon the available information, Lehman had to make the decision whether to stop the exercise -- which he hoped would be as realistic as possible, see, id. at 20, and which he regarded as essential training because of the then recent school shootings, see, id. at 8. On this Record, we cannot conclude that the available facts absolutely required him to stop the exercise, or to advise his team that someone on the campus might not know the exercise was in progress. Rather, the judgment he had to exercise was, quintessentially, a discretionary decision, for he had to select one of several appropriate courses of action within the context of the facts he knew. See, Tousignant v. St. Louis County, 1998 WL 846581 at *1 (Minn.App. December 8, 1998)("In deciding whether an act is ministerial, the court must consider whether 'the nature, quality, and complexity of the decision making process' justifies granting official immunity.") [unpublished decision], quoting Larson v. I.S.D. No. 314, 289 N.W.2d 112, 120 (Minn. 1979). While his ultimate decision may have not have been the absolute best choice, when viewed after-the-fact, and outside the pressures of that time, that is the type of decision that official immunity is designed to insulate from second-guessing. See, e.g., Dokman v. County of Hennepin, supra at 296 ("Only when officials act outside the scope of their charged authority can they be deemed to have waived this immunity and be held personally liable for their negligence.").

Finally, there is no indication, much less evidence, that either Lehman's decision not to specifically inform his team that the Reif Center was outside the exercise, or his decision to continue the exercise even after he learned that there were people on the premises who were unaware of the exercise, was done with malice or willfulness. As a consequence, we conclude that Lehman is entitled to official immunity for his actions and decisions, and therefore, we grant his Motion for Summary Judgment on the Plaintiffs' State law claims.

With respect to Akerson, the Plaintiffs have presented no specific facts upon which to challenge Akerson's claim of qualified immunity, which would tend to, in and of itself, commend our grant of his Motion. See, Gerber v. Neveauv, 578 N.W.2d 399, 403 (Minn. App. 1998)("We hold that once a defendant asserts immunity, the plaintiff has the burden to articulate specifically the claim that must be scrutinized to determine the immunity issue and to make some showing of fact to suggest the basis for the claim."). Nevertheless, viewing the entire Record objectively, we conclude that, based upon his role in the scenario, insofar as he interacted with the Plaintiffs, he is entitled to official immunity.

As we have already noted, it is uncontradicted that Akerson did not accompany the St. Louis County ERT entry team into the Reif Center, either during the initial incursion, or the subsequent