entry which resulted in the confrontation with the Plaintiffs. Moreover, there is no evidence that Akerson was informed by the entry team, or overheard their conversation, as to the reason that they had initially retreated out the first door -- the door to the Reif Center -- and then later reentered. Further, once the Plaintiffs exited the Reif Center, no one -- either his team members or the Plaintiffs -- advised Akerson that the women were not involved in the scenario. Consequently, he engaged in his assigned duties, as a part of the scenario, by issuing commands to the Plaintiffs so as move them away from the building, and by directing them to proceed to Reserve Officer Heinrich.

We find nothing in Akerson's actions which could responsibly be considered ministerial. Rather, his function in the scenario was to provide inner perimeter security, and to stop, and detain, individuals exiting the school. It was completely within his discretion as to how he should execute his duties, as would be the case generally with police officers. Moreover, there is no contention, or evidence, that Akerson acted with malice in taking the actions he did. Therefore, we conclude that Akerson is entitled to official immunity, and grant his Motion for Summary Judgment on the Plaintiffs' State law claims.

2. Vicarious Official Immunity. St. Louis County also claims an entitlement to vicarious official immunity.

"If a public official is entitled to immunity for a discretionary act, the employing entity is generally entitled to vicarious official immunity as well." Fear v. ISD 911, 634 N.W.2d 204, 216 (Minn.App. 2001). As the Minnesota Supreme Court has explained:

> When applicable, vicarious official immunity protects the government entity from suit based on the official immunity of its employee. In prior cases, "[g]enerally, if the employee is found to have immunity, the claim against the municipal employer has been dismissed without explanation." Pletan [v. Gaines], 494 N.W.2d [38,] 42 [(Minn. 1992)]. We apply vicarious official immunity when failure to grant it would focus "stifling attention" on the official's performance "to the serious detriment of that performance." Olson v. Ramsey County, 509 N.W.2d 368, 372 (Minn. 1993). In such circumstances, we have concluded that "[i]t would be anomalous * * * to impose liability on the [government employer] for the very same acts for which [the employee] receives immunity." Watson [v. Metropolitan Transit Commission], 553 N.W.2d at 415. We also suggested in dicta, however, that we might under some circumstances find an exception to vicarious official immunity and hold a governmental entity liable even though the official is not personally liable. Pletan v. Gaines, 494 N.W.2d 38, 42 (Minn. 1992). * * * [W]e clarify that a grant of vicarious official immunity to a public employer would be based on the nature of an employee's immune conduct, whether or not the employee was actually named as a defendant in a lawsuit.

Wiederholt v. City of Minneapolis, 581 N.W.2d 312, 316 (Minn. 1998).

"Whether to apply vicarious official immunity is a policy question" and, in considering police officer decisions, "[t]he need to

protect the public must be weighed against the concern that the public not be put at risk." Kuha v. City of Minnetonka, supra at 935; see also, Sletten v. Ramsey County, 2002 WL 109272 at *1 (Minn.App., January 29, 2002)(stating that the decision to apply vicarious immunity to a governmental entity is a policy question) [unpublished decision].

Since we conclude that Cuffe, Hohman, Mettler, Peterson, Scott, and Zebro, are not entitled to official immunity, then St. Louis County is not entitled to vicarious official immunity as to their actions. See, Fear v. ISD 911, supra at 215. However, we conclude that St. Louis County is entitled to vicarious immunity with respect to the actions of Akerson and Lehman. The Plaintiffs have advanced no countervailing policy considerations, which would militate against the granting of such an immunity, and we are unable to conceive of any. While the Reif Center, and Marty, argue that this case is different from those in which vicarious official immunity is normally granted, we believe the cases are analogous.

The Minnesota Supreme Court has applied vicarious official immunity to avoid "the focus of a stifling attention on the [employee's] performance, to the serious detriment of that performance," Olson v. Ramsey County, 509 N.W.2d 368, 372 (Minn. 1993), and the Minnesota Court of Appeals has applied the immunity when it "serves to avoid chilling the [employee's] exercise of his indepen-

dent judgment by allowing him to act without fearing that his conduct may eventually be subject to review by the judiciary and may expose his employer to civil liability," Ireland v. Crow's Nest Yachts, Inc., 552 N.W.2d 269, 274 (Minn.App. 1996). Here, although denying St. Louis County's request for vicarious official immunity would subject Akerson's, and Lehman's, acts to scrutiny, which may cause them to second-guess their actions in real life situations in the future, we believe that a more fundamental consideration is that they may decide not to engage in training, or would treat such training as something less than a real life situation. Given the climate of today's world, where unexpected violence greets the public with regularity, to chill the exercise, that is here in contest, out of existence, would ill serve the public's best interests. Accordingly, we believe that, under the facts presented here, such policy considerations support our grant of St. Louis County's Motion for Summary Judgment on vicarious official immunity grounds, but only with respect to Akerson's, and Lehman's actions, and we deny the paralleling Motions in regard to the actions of Cuffe, Hohman, Mettler, Peterson, Scott, and Zebro.

3. Statutory Immunity. St. Louis County also claims that it is entitled to statutory immunity for its decisions, and it actions, surrounding officer training. Pursuant to Minnesota Statutes Section 466.03, Subdivision 6, a government entity is

immune from liability for "[a]ny claim based upon the performance or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused," and this type of immunity is known as statutory immunity. Janklow v. Minnesota Bd. of Examiners, supra at 715. "Statutory immunity was created when Minnesota waived its sovereign immunity to tort suits," in 1975, in order to provide some limited exceptions to the waiver. Id. at 714. Whether a government entity is protected by statutory immunity is a question of law. See, Johnson v. State, 553 N.W.2d 40, 45 (Minn. 1996); Lishinski v. City of Duluth, 634 N.W.2d 456, 458 (Minn.App. 2001), rev. denied (Minn., January 15, 2002). The protection provided by statutory immunity is to be narrowly construed. See, Fear v. ISD 911, supra at 210.

Unlike official immunity, which protects decisions and actions at the operational level, see, S.W. and J.W. v. Spring Lake Park Sch. Dist., 580 N.W.2d 19, 22 (Minn. 1998), statutory immunity protects policy-making activities at the planning level. See, Nusbaum v. County of Blue Earth, 422 N.W.2d 713, 719 (Minn. 1988); Johnson v. State, supra at 46; Fear v. ISD 911, supra at 210 ("While planning decisions involve questions of public policy and are protected as discretionary decisions, operational decisions relate to the day-to-day government operation and are not protected as discretionary decisions."). Further, while official immunity is avail-

able to an individual, and vicarious official immunity is accorded a governmental entity, statutory immunity applies only to the governmental entity. See, Janklow v. Minnesota Bd. of Examiners, supra at 716.

In examining a claim of statutory immunity, the Court must "ascertain exactly what governmental conduct is being challenged." Fear v. ISD 911, supra at 210. Then we must examine whether the "government activity in question is planning or operational," as well as "whether the legislature intended to immunize the particular government activity that is the subject of the tort action." Johnson v. State, supra at 46.

While we recognize that several Courts have determined, in somewhat analogous circumstances, that a governmental entity's training decisions are policy-level, "planning" decisions, that are protected by statutory immunity, see, e.g., Watson v. Metropolitan Transit Commission, supra at 413; Fear v. ISD 911, supra at 212; In re Alexandria Accident of February 8, 1994, 561 N.W.2d 543, 548 (Minn.App. 1997); Maras v. Brainerd, 502 N.W.2d 69, 78 (Minn.App. 1993), we conclude that St. Louis County's decision to have their employees train at the Grand Rapids High School on July 14, 1999, is not the decision that the Plaintiffs are contesting. Rather, the Plaintiffs are challenging the actions taken by Cuffe, Hohman, Mettler, Peterson, Scott and Zebro, when they decided to confront

the Plaintiffs, even though they had reason to believe that the women were not involved in, or not advised of, the exercise.

As a result, the "planning" level decisions, which were made by St. Louis County in committing its ERT to the training, are not the decisions being disputed. Moreover, there can be no contention that the individual decisions, by the ERT members, were somehow policy infused, planning level decisions. Consequently, we conclude that St. Louis County is not entitled to statutory immunity, as to the claims related to the actions by Cuffe, Hohman, Mettler, Peterson, Scott, and Zebro, and we deny the County's Motion for Summary Judgment on that ground.

In sum, we conclude that the Plaintiffs' claim, under Section 1983, can proceed only against Cuffe, Hohman, Mettler, and Zebro. Further, their State law claims of negligent, and intentional, infliction of emotional distress, assault, battery, and false imprisonment, can proceed only against St. Louis County, Cuffe, Hohman, Mettler, Peterson, Scott, and Zebro. Finally, St. Louis County cannot be held liable for any acts, or decisions, by Akerson or Lehman. In all other respects, we grant the Motions of St. Louis County, Akerson, Lehman, Peterson, and Scott, for Summary Judgment.

2. The Motions of Grand Rapids for Summary Judgment.

The Plaintiffs have asserted Federal claims, under Section 1983, as well as State law claims of negligent and intentional infliction of emotional distress, assault, battery, and false imprisonment, against the City of Grand Rapids. The Plaintiffs have not, however, sued any individual Grand Rapids officials. In turn, Grand Rapids has moved for Summary Judgment, and claims that the Plaintiffs have failed to allege an unconstitutional policy or custom, and therefore, that they cannot sustain a Section 1983 action against the City under Monell v. Department of Social Servs., supra at 694. The City also asserts that the State law causes of actions must be dismissed, because of the doctrines of vicarious official immunity, and statutory immunity, and also contends that the public duty doctrine precludes liability against it, and that no viable State tort claims exist.

The Plaintiffs have conceded that they have not alleged that an unconstitutional policy, or custom, by the City of Grand Rapids, caused them constitutional injury, and they also admit that no employee of Grand Rapids directly violated their constitutional rights. Therefore, the Plaintiffs cannot sustain their Section 1983 cause of action against Grand Rapids, and we grant its Motion for Summary Judgment on the Plaintiffs' Federal claims.

Moreover, the Plaintiffs Schafroth, and Wilson, have also conceded that their intentional tort claims -- that is, for assault, battery, false imprisonment, and intentional infliction of emotional distress -- are subject to a two-year statute of limitations. See, Minnesota Statutes Section 541.07 ("[T]he following actions shall be commenced within two years: * * * for libel, slander, assault, battery, false imprisonment * * *."); Hayes v. Blue Cross Blue Shield of Minnesota, 21 F. Supp.2d 960, 977 (D. Minn. 1998) ("Under Minnesota law, an action for an intentional tort must be commenced within two years after the accrual of the claim, or it is statutorily barred."). Since Grand Rapids was not joined in this case until late August, or early September, of 2001 -- two years and one and one-half months after the incident on July 14, 1999, these tort claims are not actionable. Accordingly, we grant Grand Rapids' Motion for Summary Judgment on Schafroth's, and Wilson's, claims of intentional infliction of emotional distress, assault, battery, and false imprisonment.

Lastly, even though Grand Rapids moved for Summary Judgment on Miskovich's claims of intentional infliction of emotional distress, assault, battery, and false imprisonment, see, Defendant City of Grand Rapids' Memorandum of Law in Support of Motion for Summary Judgment, at 21-24, Miskovich has wholly failed to address Grand Rapids' Motion as to the intentional infliction of emotional dis-

tress claim. More importantly, the Plaintiffs also admit that they "do not claim that any of the acts of Grand Rapids city employees were intentional,"[14] Plaintiffs' Memorandum in Response to City of Grand Rapids' Motion for Summary Judgment, at 19, and that "all of Plaintiffs' complaints against the City of Grand Rapids are grounded in negligence," see, id. at 28. Given these concessions, Miskovich has abandoned her intentional tort claims against the City of Grand Rapids and, therefore, we grant the City's Motion for Summary Judgment on those claims.

Therefore, the only remaining claims against Grand Rapids are the claims of negligent infliction of emotional distress by Schafroth, Wilson, and Miskovich, as well as claims of joint venture or joint enterprise.[15] Since many of the defenses raised by Grand

[14]Enigmatically, in the next sentence of their Memorandum, the Plaintiffs state that "[t]he evidence indicates that City of Grand Rapids Police Reserve Officer Heinrich pointed a gun at Plaintiffs * * * in spite of the fact that there was evidence that Plaintiffs were not involved in the training exercise," and that "Heinrich's actions were intentional as defined by Minnesota Law and as such are not subject to official immunity." Plaintiffs' Memorandum in Response to City of Grand Rapids' Motion for Summary Judgment, at 19. Moreover, they also assert that Heinrich's actions constitute unreasonable force. Id. at 28. Nonetheless, the Plaintiffs later assert that "all of Plaintiffs' complaints against the City of Grand Rapids are grounded in negligence." Id. at 28 (referring to the statute of limitations problem for Schafroth, and Wilson, but also referring to their claims as they relate to all of the Plaintiffs in general).

[15]The Plaintiffs assert that Grand Rapids was in a joint enter-
(continued...)

Rapids -- including vicarious official, and statutory immunity -- mirror those raise by St. Louis County, we will not set forth the contours of those pertinent doctrines. Rather, we incorporate our previous discussion of the law applicable to vicarious official, and statutory immunity, without reiterating those legal principles again.

---

[15](...continued)
prise, or a joint venture with St. Louis County, when the St. Louis County ERT encountered the Plaintiffs, and therefore, that St. Louis County's negligence should be imputed to Grand Rapids on a theory of shared liability. "Courts apply the joint venture or joint enterprise doctrine 'when necessary to impute negligence between two entities that otherwise have no legal relationship.'" Beehner v. Cragun Corp., 636 N.W.2d 821, 832 (Minn.App. 2001), quoting Stelling v. Hanson Silo Co., 563 N.W.2d 286, 290 (Minn.App. 1997). Joint enterprise is established by showing: 1) a mutual undertaking for a common purpose; and 2) a right to a voice in the direction and control of the means to carry out that purpose. See, Mellett v. Fairview Health Servs., 634 N.W.2d 421, 424 (Minn. 2001). In turn, a joint venture requires the following: 1) contribution of resources; 2) joint proprietorship and control over the subject matter of the property engaged in the joint venture; 3) sharing of profits by express or implied agreement; and 4) an express or implied contract showing the joint venture. Beehner v. Cragun Corp., supra at 832.

Grand Rapids did not argue Summary Judgment, as to the joint venture contentions, in its initial brief. Rather, once the Plaintiffs noted that they still maintained their claim of joint venture, Grand Rapids argued, in its Reply Memorandum, that there was no joint venture in this case. See, City of Grand Rapids' Reply Memorandum of Law in Support of the Motion for Summary Judgment, at 10-11. We will not address that argument, however, as the Plaintiffs were not afforded an opportunity to respond, and because Grand Rapids has never moved for Summary Judgment on an asserted claim of joint enterprise.

a. Vicarious Official Immunity. The Plaintiffs have not named any of Grand Rapid's employees, who were involved in the training exercise on July 14, 1999, as Defendants in their respective actions. Nonetheless, vicarious official immunity is still available to the City. See, Wiederholt v. City of Minneapolis, supra at 316 ("[W]e clarify that a grant of vicarious official immunity to a public employer would be based on the nature of an employee's immune conduct, whether or not the employee was actually named as a defendant in a lawsuit."). "To deny a government employer vicarious official immunity simply because the official was not named in the suit would allow plaintiffs to defeat immunity by declining to name the official as a defendant." Id. at 317.

To determine whether Grand Rapids is entitled to vicarious official immunity, which is ultimately a policy decision, see, Kuha v. City of Minnetonka, supra at 935, we must look at the actions of the Grand Rapids officials who, the Plaintiffs allege, were negligent. See, Wiederholt v. City of Minneapolis, supra at 216; Gerber v. Neveauv, supra at 403 ("We hold that once a defendant asserts immunity, the plaintiff has the burden to articulate specifically the claim that must be scrutinized to determine the immunity issue and to make some showing of fact to suggest the basis for the claim."). In this instance, the Plaintiffs have isolated the following acts of the employees of Grand Rapids: the failure of the

Reserve Officers to be at their posts by 6:45 o'clock a.m., which was the time Valley claimed he set them to be there, see, Valley Deposition, at 31, Helmer Deposition, at 10 (in position by probably 8:15 o'clock a.m.), Bylkas Deposition, at 8-12 (in position between 8:45 and 9:00 o'clock a.m.), Kotula Deposition, at 13 (in position by about 8:45 o'clock a.m.); the action by Heinrich in pointing her gun at, as well as in detaining, the Plaintiffs when directed to do so by Akerson, see, Heinrich Deposition, at 26-27; the fact that Valley informed the media about the training, but did not ensure that they broadcasted any information about the exercise, see, Valley Deposition, at 21-23; the fact that the maps that Valley provided to the teams only depicted the first floor of the high school, and the maps did not portray the Reif Center, see, id. at 51-53; the fact that Valley did not specifically inform the officers that the Reif Center was off limits, and describe the position of the Reif Center, see, Mettler Deposition, at 12, Zebro Deposition, at 14, Scott Deposition, at 41, Akerson Deposition, at 45, Cuffe Deposition, at 17; and the fact that, although Valley believed that the doors which were not supposed to be entered in the training exercise would be locked, see, Valley Deposition, at 55, 77, and he had advised the teams as such, see, id., at 54-55, Lehman Deposition, at 81, Mettler Deposition, at 10, Zebro Deposition, at 10, Cuffe Deposition, at 17, he did not double-check to

ensure that the doors were indeed locked, see, Valley Deposition, at 55.

In analyzing the applicability of official immunity to these individualized acts, and vicarious official immunity, as claimed by Grand Rapids, we first turn to the decisions, and actions, of Valley. Under the circumstances, we find Valley's acts and decisions to be distinctly discretionary. Valley was charged with planning the training for police officers, in the wake of the then recent tragedy at Columbine High School. He had to decide how to commit his available resources, who to invite to the training exercise, what scenarios should be employed, what facilities should be used, and how to best insure the safety of all concerned, including the public. See, Tousignant v. St. Louis County, supra at *1 ("In deciding whether an act is ministerial, the court must consider whether 'the nature, quality, and complexity of the decision making process' justifies granting official immunity."), quoting Larson v. I.S.D. No. 314, supra at 120.

In completing these tasks, necessarily, Valley had to delegate certain of his duties. Therefore, the fact that he asked the newspaper, and the radio and television stations, to broadcast messages about the training, does not translate into an absolute, immutable duty to check on the status of those broadcasts, especially in view of all of the other tasks he had to accomplish so as to effectuate

an effective, and safe, training program. Thus, we conclude that his decision, to not double-check the status of the public media announcements, was truly a discretionary decision.

The same is true for the status of the doors, as Valley thought the school's janitors would lock the doors to those areas of the campus which were off limits, and he advised the teams to that effect. It was understandable, given the hectic morning of the training exercise, that he did not double check to ensure that the doors were locked, and we find no absolute, certain duty, on his part, to do so. Therefore, we find nothing to erode Valley's entitlement of official immunity to this decision.

Moreover, paralleling our discussion related to Lehman, we cannot say that Valley's decision, concerning the information he provided to the teams regarding the Reif Center, as well as the fact that the maps he distributed included only one floor, amounted to ministerial decisions. As we have stated, the training scenario was to be as realistic as possible. Therefore, Valley only informed the teams of the information he thought was necessary in order to allow them to complete the training. His decision not to specifically tell the officers about the Reif Center is understandable, given his belief that all of the doors to the areas, which were not to be included in the exercise, would be locked, and that all of the individuals on campus had been notified of the

training, either through Adams, or by the barricades set up at the entrances to the campus. Moreover, he could properly assume, as a proper exercise of discretion, that the maps, which did not include the Reif Center, would alert the teams that the Reif Center -- although not specifically identified by name -- was not part of the scenario.

Further, while the maps distributed by Valley only included the first floor of the high school, we do not believe that his decision, to only distribute that map, amounts to a ministerial act. First, most of the training program was only to occur on the first floor of the school, so there was no need for a map of the second or third floors.[16] Moreover, the fact that the third scenario was to occur on the third floor was intentionally concealed by Valley, so to insure a realistic feel to the training, is plainly a discretionary act. Finally, Valley's decisions were predicated on his understanding that only the areas in play would be unlocked, and all other areas would be inaccessible. Consequently, even though, after-the-fact, some might characterize Valley's decisions

[16]By every appearance in this Record, the Reif Center is considered to be the second floor of the school, and it does not appear that Valley, or anyone else, purposely removed the Reif Center from the map of the first floor. See, Exs. R, S and T to Aff. of Jason J. Kuboushek (maps of the first, second, and third floors of the high school, which show the Reif Center on the second floor).

as being wrong, or even negligent, because they emanated from his exercise of discretion, they are protected by official immunity.[17]

Even though Valley is protected by official immunity, we are obligated to determine, nonetheless, whether Grand Rapids is entitled to vicarious official immunity for Valley's alleged negligence. For reasons we have previously detailed, we conclude that weighty policy considerations support a grant of Grand Rapid's invocation of vicarious official immunity, and we grant Grand Rapid's Motion for Summary Judgment on those grounds.

The acts of the Reserve Officers were not discretionary, for they were to stand guard, at the barricades, as directed by Valley, at 6:45 o'clock a.m. They did not man their posts, however, until well after that time. While disagreements abound in this Record as to when the Reserve Officers were at their assigned posts, there can be no doubt that their responsibility, in informing visitors about the training exercise, were absolute and certain -- they were purely ministerial. Therefore, not arriving at the barricades at the time that they were directed to do so, and allowing persons to pass through the barricades without telling them about the training -- thereby allowing the Plaintiffs into the school without verbal

[17]There is neither a contention, nor a showing, that Valley's decisions were prompted by malice or willfulness, so as to strip him of official immunity.